UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

David "Cammie" Cameron,

    Plaintiff,

    v.                                                                 Civil Action No. 5:18–cv–204–gwc–jmc

Lisa Menard,
Mark Potanas,
Joshua Rutherford,

    Defendants.

## <u>REPORT AND RECOMMENDATION</u>
(Docs. 3, 6, 11)

    Plaintiff Cammie Cameron brings this action under 42 U.S.C. § 1983 against

Lisa Menard, the former Commissioner of the Vermont Department of Corrections

(DOC), Mark Potanas, the former superintendent of Southern State Correctional

Facility (SSCF), and Joshua Rutherford, the Chief of Security for SSCF (collectively

Defendants).  (Doc. 1 at 1–2, ¶¶ 1–6.)  Cameron, who is a transgender female, alleges

that Defendants ignored her request to be incarcerated with female inmates and

that, as a result of being housed with male inmates, Cameron was assaulted by

another prisoner, violating her Eighth Amendment rights in three ways: (1) by

failing to protect her from a substantial risk of serious harm (*id.* at 4–5, ¶¶ 19–25);

(2) by inadequately training the correctional officers at SSCF (*id.* at 5–6, ¶¶ 26–32);

and (3) by ineffectively supervising the correctional officers at SSCF (*id.* at 6–7,

¶¶ 33–39).  Relying on supplemental jurisdiction, Cameron also brings state-law

claims for negligence and false imprisonment.  (*Id.* at 7–8, ¶¶ 40–42.)  Based on these claims, Cameron seeks compensatory and punitive damages, as well as attorney's fees and other litigation costs.  (*Id.* at 8–9.)

Presently before the Court are Potanas's Motion to Dismiss for Failure to State a Claim under Fed. R. Civ. P. 12(b)(6) (Doc. 3), Menard and Rutherford's Motion to Dismiss for Failure to State a Claim (Doc. 6), and Cameron's Motion to Strike All Evidence of her *Nolo Contendre* Plea.  (Doc. 11.)  For the reasons set forth below, I recommend that the Court decline to take judicial notice of Cameron's *nolo contendere* plea transcript and that the Court exclude the plea transcript from the record; accordingly, I recommend that Cameron's Motion to Strike be DENIED as moot. (Doc. 11.)  Further, concluding Cameron has plausibly alleged that Defendants failed to protect her in violation of the Eighth Amendment, Defendants' Motions to Dismiss that claim should be DENIED.  With respect to Cameron's remaining claims—that Defendants failed to adequately train and supervise the SSCF correctional officers and that Defendants are liable for negligence and false imprisonment—I recommend that the Court GRANT Defendants' Motions to Dismiss.  (Docs. 3, 6.)

## Factual and Procedural Background

In her Complaint, Cameron alleges that, during her intake, DOC officials identified her as a transgender female and that Defendants specifically knew that she is a transgender female.  (Doc. 1 at 2–4, ¶¶ 11, 14, 20.)  Because she identifies as female, Cameron states that she asked to be lodged with female inmates, but DOC

officials—including Defendants—deliberately denied her request and instead placed her with male inmates at SSCF.  (*Id.* at 3, ¶ 14.)  Cameron alleges that Defendants knew that, as a transgender female, Cameron faced a substantial and obvious risk of serious harm if she was placed in the male population at SSCF.  (*Id.* at 2–4, ¶¶ 11, 14, 20.)  Cameron further alleges that Defendants deliberately ignored this substantial risk by refusing her housing request and by failing "to enforce the classification system" in DOC policy.  (*Id.* at 3–4, ¶¶ 13, 20–30; *see also* Docs. 3-3, 6-4.)

Cameron further claims that, because she was placed in the male population, she endured ridicule, threats, and harassment and that Defendants Potanas and Rutherford were present during the threats and harassment, alerting Potanas and Rutherford to the specific risk that Cameron faced as a female transgender inmate in the male population.  (Doc. 1 at 3, ¶ 15.)  This included "being called, 'David,' instead of her requested name, 'Cammie'" and "being subjected to constant sexual harassment, comments, demands, and threats by male inmates in the presence of . . . Defendants Potanas and Rutherford."  (*Id.*)  Likewise, Cameron asserts that Potanas and Rutherford were specifically aware that another inmate, Francis Lajoice, was a threat to Cameron and that, despite this knowledge, Potanas and Rutherford disregarded the risk and "placed Lajoice in the cell immediately adjacent to [Cameron]."  (*Id.* ¶ 16.)

Then, on December 21, 2015, Cameron asserts that Lajoice attacked her. (*Id.* ¶ 17.)  After the attack, Cameron alleges that she "was found lying on the ground

with 'blood pouring from her nose and mouth,' her 'right eye was swollen shut and purple,' and she 'had several bumps and bruises on her forehead and temple areas.'" (*Id.*)  Cameron was hospitalized for "multiple contusions to her forehead, right eye, cheek and jaw, a fractured nose, major closed head injury, left cerebral hemorrhage, left subdural hematoma and concussion."  (*Id.* ¶ 18.)

Following her assault, Cameron brought the present § 1983 claim, asserting that Defendants' actions constituted three violations of the Eighth Amendment. First, she alleges that Defendants, knowing that she is a transgender female, deliberately ignored a substantial risk of serious harm to her safety when they placed her in the male population at SSCF and when they failed to classify Cameron according to the DOC classification system.  (*Id.* at 4–5, ¶¶ 19–25.)  Second, she alleges that Defendants were responsible for properly training the correctional officers at SSCF and that, by failing to adequately train those officers, Defendants caused the unsafe conditions at SSCF that ultimately resulted in Cameron's injuries. (*Id.* at 5–6, ¶¶ 26–32.)  Finally, Cameron claims that Defendants failed to adequately supervise the correctional officers at SSCF, producing the unconstitutional conditions that resulted in Cameron's injury.  (*Id.* at 6–7, ¶¶ 33–39.)  Ultimately, according to Cameron, her assault occurred because Defendants disregarded both the general risks that she faced as a transgender female placed amongst male inmates and, with regard to Potanas and Rutherford, the specific risk posed by Lajoice.  (*Id.* at 3, ¶¶ 14, 17, 18.)

In addition to her Eighth Amendment claims, Cameron brings two state-law claims under the auspices of supplemental jurisdiction.  First, she asserts that Defendants negligently failed in their duty to protect her from unreasonable risk of harm.  (*Id.* at 7–8, ¶¶ 40–42.)  And second, Cameron claims that she was falsely imprisoned, asserting that, after she was assaulted by Lajoice, she "was disciplined and her period of incarceration was extended beyond her minimum."  (*Id.* at 8, ¶ 44.)

In their Motions to Dismiss, Defendants assert that Cameron fails to state a cognizable federal claim under § 1983.  (Doc. 3 at 8; Doc 6 at 8.)  Specifically, Defendants argue that Cameron fails to allege objective harm or subjective intent as required by the Eighth Amendment and they further claim that Cameron has not plausibly alleged that Defendants were personally involved in the purported constitutional violation.  (Doc. 3 at 11, 16; Doc. 6 at 11, 16.)  As support, Defendants request that this Court take judicial notice of DOC Directive 423.01 (Docs. 3-3, 6-4), which Defendants assert required Cameron to inform Defendants if she believed that she was at risk of assault.  (Doc. 3 at 18 n.80; Doc. 6 at 19 n.12.)  Defendants also ask this Court to take judicial notice of a change-of-plea proceeding during which Cameron pled *nolo contendere* to simple assault.  (*See generally* Docs. 3-1, 6-2.)  According to Defendants, the transcript of the change-of-plea proceeding conclusively establishes that Cameron was the aggressor in the altercation with Lajoice, negating Cameron's ability to succeed on her Eighth Amendment claim.  (Doc. 3 at 14–15 (citing *Louis-Charles v. Courtwright*, Civil Action No. 9:11-cv-147 (GLS/TWD),

2014 WL 457951, at *6 (N.D.N.Y. Feb. 4, 2014); Doc. 6 at 15 (citing *Louis-Charles*, 2014 WL 457951, at *6).)

In response, Cameron has filed a Motion to Strike All Evidence of her *Nolo Contendere* Plea. (Doc. 11.) In doing so, Cameron asserts that under Federal Rule of Evidence 410(a)(2), evidence of a *nolo contendere* plea "is not admissible against the defendant who made the plea or participated in the plea discussions" and that, as a result, the Court may not take judicial notice of her *nolo contendere* plea. Fed. R. Evid. 410(a). In addition, Cameron has filed a Response in Opposition to the Motions to Dismiss arguing that, if the Court takes judicial notice of the documents filed by Defendants, the Court should treat the Motions to Dismiss as a summary judgment motion pursuant Federal Rule of Civil Procedure 12(d). (Doc. 12 at 2, ¶ 5.) For that purpose, Cameron has appended several documents to her Response in Opposition. (Docs. 12-1–12-5.)

Defendants oppose Cameron's Motion to Strike, claiming that the Court may take judicial notice of the fact of Cameron's conviction. (*See generally* Doc. 14.)

## Analysis

### I.    Request to Take Judicial Notice and Motion to Strike

Prior to considering whether Cameron's allegations survive Defendants' Motions to Dismiss, the Court must first address Defendants' request that this Court take judicial notice of two documents: the transcript of a change-of-plea proceeding conducted in Vermont state court on May 3, 2017, during which Cameron pled *nolo*

*contendere* to simple assault (*see* Docs. 3-1, 6-2); and DOC Directive 423.01, which establishes DOC policy for ensuring the safety of transgender inmates.  (*See* Docs. 3-3, 6-4.)  As described above, in response to Defendants' request, Cameron has moved to strike her *nolo contendere* plea and requested that Defendants be ordered to resubmit their Motions to Dismiss without the inadmissible references and evidence. (Doc. 11.)  Alternatively, Cameron moves under Rule 12(d) to convert Defendants' Motions to Dismiss to a summary judgment motion and, for summary judgment purposes, Cameron has submitted several documents and an affidavit.  (Doc. 12 at 2, ¶ 5; *see also* Docs. 12-1–12-5.)

Concluding that Cameron's admissions during her *nolo contendere* plea are subject to reasonable dispute, the Court cannot take judicial notice of the change-of-plea hearing and must exclude the transcript from the record.  (*See* Docs. 3-1, 6-2.) On the other hand, the Court may take judicial notice of DOC Directive 423.01.  (*See* Docs. 3-3, 6-4.)  Moreover, because Cameron's *nolo contendere* plea does not satisfy the judicial notice standard and may be excluded on that basis, Cameron's Motion to Strike should be denied as moot.  (*See* Doc. 11.)  Finally, given that discovery is likely to reveal critical facts, the Court should decline to convert Defendants' Motions to Dismiss to a summary judgment motion and should exclude the documents proffered by Cameron in support of summary judgment.  (*See* Docs. 12-1–12-5.)

At the motion to dismiss stage, a court "may consider all papers and exhibits appended to the complaint, as well as any matters of which judicial notice may be taken."  *Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085, 1092 (2d Cir. 1995).  A court

may take judicial notice of a fact "that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b).  Further, under Federal of Civil Procedure Rule 12(d), where "matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56."  "In other words, if parties submit extrinsic evidence, the court has two options: (1) it may exclude such evidence and decide the motion on the complaint alone or (2) convert the motion to one for summary judgment and consider the extrinsic evidence."  *Vailette v. Lindsay*, No. 11-CV-3610 (NGG)(RLM), 2014 WL 4101513, at *7 (E.D.N.Y. Aug. 18, 2014) (internal quotation marks omitted).

With that background in mind, the Court turns to the documents proffered by the parties.  First, as to the change-of-plea transcript filed by Defendants and the documents submitted in response by Cameron, under Federal Rule of Evidence 410(a)(2), evidence of a *nolo contendere* plea "is not admissible against the defendant who made the plea or participated in the plea discussions."  A *nolo contendere* plea is inadmissible because in most jurisdictions, including Vermont, a *nolo* plea is not an admission that the pleader committed the crime.  *State v. Plante*, 2010 VT 116, ¶ 3, 189 Vt. 556, 15 A.3d 120 (2010)  ("[T]he plea of *nolo*, itself, in contrast to the guilty plea, is not considered an admission of guilt for purposes of a subsequent criminal proceeding or a civil proceeding based on the underlying conduct.").  Instead, "[a *nolo* plea] reflects the defendant's agreement that, should the matter go to trial, the State

8

has sufficient, admissible evidence to convince a jury of the defendant's guilt." *Id.*; *see also North Carolina v. Alford*, 400 U.S. 25, 36 n.8 (1970) ("Throughout its history . . . the plea of *nolo contendere* has been viewed not as an express admission of guilt but as a consent by the defendant that he may be punished as if he were guilty and a prayer for leniency.")  Put another way, a *nolo contendere* plea is not an adjudication of the underlying factual issues but a waiver of the right to contest those facts.  Accordingly, the facts elicited during the *nolo* plea cannot be introduced in a later trial for estoppel purposes, because the issues sought to be precluded were not actually adjudicated or established with reasonable certainty.  *See Lipsky v. Commonwealth United Corp.*, 551 F.2d 887, 893–94 (2d Cir. 1976) ("[P]leas of *nolo contendere* are not true adjudications of the underlying issues; a prior judgment can only be introduced in a later trial for collateral estoppel purposes if the issues sought to be precluded were actually adjudicated in the prior trial.").

For example, in *Thomas v. Roach*, the Second Circuit addressed a plaintiff's claim under 42 U.S.C. § 1983 that police officers used excessive force when arresting him.  165 F.3d 137, 144 (2d Cir. 1999).  To rebut the claim, the defendant police officers attempted to introduce evidence showing that the plaintiff pled *nolo contendere* to various state charges arising out the arrest, including one count of assault on a peace officer.  *Id.*  Specifically, the defendants sought to show that, during his *nolo contendere* plea, the plaintiff admitted that he was the aggressor and that he assaulted one of the officers prior to the plaintiff's arrest.  *Id.*  The Second Circuit rejected this argument, stating that, by pleading *nolo contendere*, the plaintiff

had not admitted to the assault, but "only admitted his recognition that he probably would lose if he went to trial." *Id.*

Given the foregoing, this Court is plainly barred from taking judicial notice of the admissions Cameron made during her *nolo contendere* plea. Put simply, Cameron chose not to contest the factual basis for her simple assault conviction; likewise, she did not contest whether or not she was the aggressor in the fight with Lajoice. *See id.* Accordingly, the facts revealed during Cameron's plea allocution remain subject to reasonable dispute and this Court cannot take judicial notice of those facts.[1] *See* Fed. R. Evid. 201(b); 410(a)(2).

Of course, Defendants remain free during the discovery stage to elicit admissible evidence proving that Cameron was the aggressor in the fight with Lajoice. And given this possibility—that significant relevant facts may be revealed during discovery—the Court should decline Cameron's request to convert the Motions to Dismiss to summary judgment motions and should exclude the documents proffered by Cameron in her Response. *See Vailette*, 2014 WL 4101513, at *7

---

[1] Defendants correctly point out (*see* Doc. 14 at 6) that the Second Circuit has interpreted Rule 410(a)(2) to allow the admission of convictions upon a plea of *nolo contendere* where the fact of a conviction is all that matters. *See, e.g., Sokoloff v. Saxbe*, 501 F.2d 571, 574 (2d Cir. 1974); *United States v. Banks*, 776 F.3d 87, 92 (2d Cir. 2015) ("[W]here the fact of conviction is all that matters, . . . there is no distinction among *Alford*, *nolo contendere*, and standard guilty pleas in the disposition of criminal cases." (internal quotation marks omitted)). But Defendants are not correct that this precedent permits this Court to take judicial notice of the facts stated on the record during Cameron's *nolo* plea and, in particular, Cameron's purported admission that she instigated the assault. To reiterate, Cameron's admissions during the *nolo* plea cannot be introduced for estoppel purposes because the issues sought to be precluded in the subsequent proceeding were not actually adjudicated or established with reasonable certainty. *See Lipsky v. Commonwealth United Corp.*, 551 F.2d 887, 894 (2d Cir. 1976). By contrast, because the simple fact that Cameron was convicted is not subject to reasonable dispute, the Court could take judicial notice of the conviction. *See Banks*, 776 F.3d at 92. Accordingly, to the extent that Defendants' arguments specifically rely on the contents of Cameron's *nolo contendere* plea, such as their assertion that Cameron was the aggressor, the Court must disregard their arguments. (Doc. 3 at 7; Doc. 6 at 7.)

(declining to convert motion to dismiss to summary judgment motion); *Cassotto v. Potter*, Civil Action No. 3-07-cv-266 (JCH), 2007 WL 2121239, *1 (D. Conn. July 20, 2007) (refusing to consider documents defendant proffered on motion to dismiss and, therefore, refusing to convert motion to dismiss into motion for summary judgment); *Stephens v. Bayview Nursing & Rehab. Ctr.*, No. 07-CV-0596 (JFB)(AKT), 2008 WL 728896, at *2 (E.D.N.Y. Mar. 17, 2008) ("Federal courts have complete discretion to determine whether or not to accept the submission of any material beyond the pleadings offered in conjunction with a Rule 12(b)(6) motion, and thus complete discretion in determining whether to convert the motion to one for summary judgment." (internal quotation marks omitted)).

On the other hand, for purposes of the Motions to Dismiss, the Court may take judicial notice of DOC Directive 423.01 because it is not subject to reasonable dispute that, at the time the assault allegedly occurred, Directive 423.01 set forth the standards for safely housing inmates who identify as transgender.  (*See* Docs. 3-3, 6-4); *see also Cameron v. Menard*, Civil Action No. 5:16-cv-71-gwc-jmc, 2016 WL 5017390, at *3 n.l (D. Vt. Aug. 24, 2016) (citation omitted) ("The Court may take judicial notice of [Vermont] DOC procedures."); *Adorno v. Semple*, CASE NO. 3:16-CV-325 (MPS), 2016 WL 7469709, at *6 (D. Conn. Dec. 28, 2016) (taking judicial notice of a DOC administrative directive).

For the reasons set forth above, I recommend that the Court decline to take judicial notice of Cameron's statements during her *nolo contendere* plea and that the Court exclude the May 3, 2017 change-of-plea transcript from the record.  (*See* Docs.

3-1, 6-2.)  Further, because the Court may exclude the change-of-plea transcript solely on the basis that the transcript does not satisfy the judicial notice standard, Cameron's Motion to Strike should be denied as moot.  (*See* Doc. 11.)  I conclude, however, that the Court may take judicial notice of DOC Directive 423.01.  Finally, I recommend that the Court decline to convert Defendants' Motions to Dismiss to summary judgment motions and exclude the documents proffered by Cameron in support of summary judgment.  (*See* Docs. 12-1–12-5.)

## II.    Motions to Dismiss

The Court next turns to Defendants' Motions to Dismiss.  (Docs. 3, 6.)  As to the claims Cameron brings under the Eighth Amendment, it is concluded that that Cameron has plausibly alleged that Defendants knowingly failed to protect her from a substantial risk of serious harm.  By contrast, Cameron's allegations do not support an inference that Defendants' failure to adequately train and supervise the SSCF correctional officers caused the unconstitutional conditions that led to her assault.  Further, Cameron's state-law claims should be dismissed because the state-law doctrine of official immunity shields Defendant Menard and, moreover, under Vt. Stat. Ann. tit. 12, § 5601(a), the Vermont Superior Courts have exclusive jurisdiction over lawsuits resulting from state employee torts.

### A.    Legal Standards

#### 1.    Motion to Dismiss

"To survive a [Rule 12(b)(6)] motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible

on its face." *Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)); *see also* Fed. R. Civ. P. 8(a)(2). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. Plausibility is not akin to a probably requirement, "[a] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of the facts alleged is improbable, and that a recovery is very remote and unlikely." *Nielsen*, 746 F.3d at 62 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). Nevertheless, a plaintiff's complaint must allege facts that permit "more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678. To survive a motion to dismiss, the plaintiff must at least allege facts that "nudge[] [his or her] claims across the line from conceivable to plausible." *Bell Atl. Corp.*, 550 U.S. at 570.

As discussed above, in determining if a plaintiff has met this standard, "the Court may consider documents attached as an exhibit [to the complaint] or incorporated by reference, documents that are 'integral' to plaintiff's claims, even if not explicitly incorporated by reference, and matters of which judicial notice may be taken." *Thomas v. Westchester Cty. Health Care Corp.*, 232 F. Supp. 2d 273, 275 (S.D.N.Y. 2002) (citations omitted). Ultimately, after considering these sources, "[d]etermining whether a complaint states a plausible claim for relief [is] . . . a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

### 2.    42 U.S.C. § 1983

Under 42 U.S.C. § 1983, a plaintiff may bring suit "against '[e]very person who, under color of any statute . . . of any State . . . subjects, or causes to be subjected, any citizen . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws . . . .'" *Wyatt v. Cole*, 504 U.S. 158, 161 (1992) (alterations in original) (quoting 42 U.S.C. § 1983). The U.S. Supreme Court has identified two elements of a § 1983 claim: "[A] plaintiff must allege [(1)]the violation of a right secured by the Constitution and laws of the United States, and [(2)] must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988).

In this case, Cameron asserts that Defendants violated her rights under the Eighth Amendment. To succeed on an Eighth Amendment claim, a prisoner "must show (1) a deprivation that is objectively, sufficiently serious . . . and (2) a sufficiently culpable state of mind on the part of the defendant official." *Gaston v. Coughlin*, 249 F.3d 156, 164 (2d Cir. 2001) (internal quotation marks omitted). In the prison context, courts have defined this culpability as "deliberate indifference" to the health and safety of inmates. *See Farmer v. Brennan*, 511 U.S. 825, 834 (1994).

### B.    Failure to Protect

### 1.    Constitutional Violation

Under the Eighth Amendment, prison officials have a duty to "take reasonable measures to guarantee the safety of . . . inmates." *Farmer*, 511 U.S. at 832 (internal quotation marks omitted). More to the point, prison officials "have a duty to protect

prisoners from violence at the hands of other prisoners." *Id.* at 833 (internal quotation marks omitted).  Of course, not every injury an inmate suffers at the hands of another inmate gives rise to constitutional liability.  A prison official violates the Eighth Amendment only when objective and subjective requirements are met.  *Id.* at 835.

First, the claimed deprivation must be objectively serious; in the context of a failure-to-protect claim, "the inmate must show that he [or she] is incarcerated under conditions posing a substantial risk of serious harm."  *Id.* at 834.  With respect to this prong, the Supreme Court has suggested that "a prisoner can establish exposure to a sufficiently serious risk of harm by showing that he belongs to an identifiable group of prisoners who are frequently singled out for violent attack by other inmates."  *Id.* at 843 (internal quotation marks omitted); *see also Lumumba v. Beyor*, No. 1:13-cv-81-jgm-jmc, 2014 WL 1516320, at *5 n.3 (D. Vt. Apr. 17, 2014) (noting that *Farmer* "suggest[s] that an inmate could show exposure to a sufficiently serious risk of harm if he proved that he belonged to an identifiable group of prisoners who are frequently singled out for violent attack by other inmates" (internal quotation marks omitted)).

Second, the official must be subjectively aware of the substantial risk of serious harm.  *Farmer*, 511 U.S. at 836.  In other words, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  *Id.* at 837.  Under this prong, "[w]hether a prison official had the requisite knowledge . . . is a question of fact subject to demonstration in the usual ways, including inference from

circumstantial evidence, . . . and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Id*. at 842; *Brock v. Wright*, 315 F.3d 158, 164 (2d Cir. 2003) ("Although *Farmer* requires that a plaintiff prove actual knowledge of a risk, evidence that the risk was obvious or otherwise must have been known to a defendant is sufficient to permit a jury to conclude that the defendant was actually aware of it."). In particular, "[w]hen analyzing subjective awareness, courts have considered . . . the defendant's knowledge about the vulnerability of certain types of inmates to risk of harm, prison policies pertaining to such inmates, and their housing placements." *Diamond v. Owens*, 131 F. Supp. 3d 1346, 1377 (M.D. Ga. 2015) (citing cases). Moreover, a prison official cannot avoid liability solely on the basis of the prisoner's failure to notify the prison official that the prisoner feared for his or her safety. *Farmer*, 511 U.S. at 848 (explaining that "the failure to give advance notice" of a risk of harm "is not dispositive"); *Hayes v. N.Y.C. Dep't of Corr.*, 84 F.3d 614, 621 (2d Cir. 1996) ("Although a prisoner's identification of his enemies is certainly relevant to the question of knowledge, it is not, necessarily, outcome determinative."). Nor can a prison official escape liability "by showing that, while he was aware of an obvious, substantial risk to inmate safety, he did not know that the [inmate] was especially likely to be assaulted by the specific prisoner who eventually committed the assault." *Farmer*, 511 U.S. at 843. In other words, subjective awareness may be established if the prison official, "acting with deliberate indifference, exposed a prisoner to a

16

sufficiently substantial risk of serious damage to his future health, and it does not matter whether the risk comes from a single source or multiple sources." *Id.* at 843–44 (internal quotation marks and citation omitted).

Here, Cameron alleges that Defendants knew that Cameron is a transgender female and, further, that Defendants knew that, as a result of being a transgender female, she faced a substantial and obvious risk of serious harm if she was placed in the male population at SSCF.  (Doc. 1 at 2–4, ¶¶ 11, 14, 20.)  Cameron further alleges that Defendants deliberately ignored this substantial risk by refusing her request to be detained in a female facility, by failing "to enforce the classification system" in DOC policy intended to protect transgender inmates, by disregarding the staffing requirements at SSCF, and by failing to adequately train and supervise the correctional officers at SSCF.  (*Id.* at 3–5, ¶¶ 13, 20–30; *see also* Docs. 3-3, 6-4.)  After her placement, moreover, Cameron alleges that she endured ridicule, threats, and harassment and that Defendants Potanas and Rutherford were present during the threats and harassment, alerting Potanas and Rutherford to the specific risk that Cameron faced as a female transgender inmate.  (Doc. 1 at 3, ¶ 15.)  Likewise, Cameron asserts that, although Potanas and Rutherford were specifically aware of the threat Lajoice presented to Cameron, they disregarded that risk and placed Lajoice in the cell next to Cameron.  (*Id.* ¶ 16.)  Ultimately, according to Cameron, her assault occurred because Defendants disregarded both the general risks that she faced as a transgender female and, with regard to Potanas and Rutherford, the specific risk posed by Lajoice.  (*Id.* ¶¶ 14, 17, 18.)

Construing these allegations in the light most favorable to Cameron, she has plausibly set forth a failure-to-protect claim against Defendants.  First, Cameron's assertions satisfy the objective prong because, as a transgender female, she is in "an identifiable group of prisoners who are frequently singled out for violent attack by other inmates." *Farmer*, 511 U.S. at 843 (internal quotation marks omitted).  Indeed, in *Farmer*, the Supreme Court tacitly acknowledged that placing a transsexual prisoner with feminine characteristics in general population could pose a significant threat to internal security in general and to the prisoner in particular.  *Id.* at 849. And the Second Circuit has reiterated the "obvious" statement that "under certain circumstances the disclosure of an inmate's . . . transsexualism could place that inmate in harm's way." *Powell v. Schriver*, 175 F.3d 107, 115 (2d Cir. 1999).

Second, Cameron plausibly alleges that Defendants were aware that she faced a heightened risk of assault, both because of its obviousness, and, for Rutherford and Potanas, because they were specifically aware of the heightened risk of harm.  (Doc. 1 at 3, ¶¶ 15–16.)  Specifically, Cameron alleges that officials in the Vermont DOC were generally aware that transgender inmates faced a heightened risk of violence, because DOC Directive 423.01 mandates that transgender individuals be screened and assessed based on the assumption that such inmates may face an enhanced risk and may cause internal security issues.  (Doc. 3-3 at 5, ¶ 2; Doc. 6-4 at 5, ¶ 2); *see Diamond*, 131 F. Supp. 3d at 1377 (noting prison policies pertaining to transgender inmates constitute circumstantial evidence of subjective knowledge).  Further, Cameron alleges that Defendants were aware that Cameron was a transgender

female based on her request to be placed in a female facility (Doc. 1 at 2–4, ¶¶ 11, 13, 14, 20), putting Defendants on notice of her vulnerability. *See Lojan v. Crumbsie*, No. 12 CV. 0320(LAP), 2013 WL 411356, at \*4 (S.D.N.Y. Feb. 1, 2013) ("[T]he argument that more than mere knowledge of [the] [p]laintiff's transgender status was required to put [the] [d]efendant on notice of [the] [p]laintiff's vulnerability is spurious."). Moreover, Cameron specifically claims that Defendants Potanas and Rutherford were present when other inmates harassed and threatened her and further contends that Potanas and Rutherford were specifically aware of the threat Lajoice presented to Cameron when they placed Lajoice in the cell next to Cameron. Finally, Cameron alleges that Defendants consciously disregarded the obvious risk that she faced by refusing her request to be detained in a female facility and by failing "to enforce the classification system" set forth in DOC Directive 423.01. (Doc. 1 at 3–5, ¶¶ 13, 20–30; *see also* Docs. 3-3, 6-4.) Accordingly, Cameron's allegations at this preliminary stage of the proceedings are sufficient to nudge her failure-to-protect claim across the line from conceivable to plausible. *Twombly*, 550 U.S. at 570.

Defendants disagree that Cameron's Complaint is sufficient to raise a failure-to-protect claim, asserting that Cameron fails to allege either objective harm or subjective intent.[2] (Doc. 3 at 11; Doc. 6 at 11.) As to subjective intent, Defendants

---

[2] Defendants also claim that Cameron cannot succeed in her failure-to-protect claim because she admitted in a prior criminal proceeding that she was the aggressor in the fight with Lajoice. (Doc. 3 at 15; Doc. 6 at 15.) As discussed above, however, because Cameron pled *nolo contendere* in that criminal proceeding, Cameron's plea allocution cannot be used in a subsequent proceeding. *See Thomas v. Roach*, 165 F.3d 137, 144 (2d Cir. 1999). Accordingly, because Defendants seek to establish that Cameron was the aggressor based on Cameron's admissions during her *nolo contendere* plea (Doc. 3 at 16; Doc. 6 at 17), the Court declines to address this argument at this time.

maintain that Cameron's allegations are insufficient because she does not contend that Defendants "knew that Lajoice presented an excessive risk to her and consciously disregarded it." (Doc. 3 at 12; Doc. 6 at 12.) Similarly, Defendants argue that, under DOC Directive 423.01, Cameron was required to notify Defendants that she was at risk of harm. (Doc. 3 at 18 n.80; Doc. 6 at 19 n.12.) As noted above, however, the Supreme Court specifically stated in *Farmer* that Defendants may not escape liability "by showing that, while [they were] aware of an obvious, substantial risk to inmate safety, [they] did not know that [Cameron] was especially likely to be assaulted by the specific prisoner who eventually committed the assault." *Farmer*, 511 U.S. at 843. Nor may Defendants avoid liability solely based on Cameron's alleged failure to notify Defendants that she feared for her safety. *Id.* at 848 (explaining that "the failure to give advance notice" of a risk of harm "is not dispositive"); *Hayes*, 84 F.3d at 621.

Similarly, although Defendants are correct that "[a]n inmate[]assault does not automatically state a failure-to-protect claim" (Doc. 3 at 12; Doc. 6 at 12), the inferences drawn from Cameron's allegations—that she was at a greater risk of being assaulted because she was a transgender female housed among male inmates and that Defendants knew of and consciously disregarded this risk—distinguish this case from the numerous cases cited by Defendants. *See, e.g.*, *Hazelwood v. Monroe*, No. 95 CIV. 3648 (DC), 1996 WL 312355, at *2 (S.D.N.Y. June 11, 1996) (dismissing complaint because plaintiff alleges no facts indicating that defendant was actually aware that plaintiff was subject to a substantial risk of being attacked by another

inmate); *Smith v. Chief Exec. Officer*, No. 00 CIV. 2521(DC), 2001 WL 1035136, at *5
(S.D.N.Y. Sept. 7, 2001) (dismissing complaint because plaintiff alleged no facts to
suggest that defendant knew that he was subjecting plaintiff to a substantial risk of
being attacked); *Houston v. Nassau Cty.*, No. 08-CV-882 (JFB)(WDW), 2012 WL
729352, at *6 (E.D.N.Y. Mar. 7, 2012) ("Plaintiff fails to indicate whether he was at a
greater risk of being assaulted than his fellow inmates and, if he was, how the
County, or any of the defendants, would have knowledge of this information.");
*Bridgewater v. Taylor*, 698 F. Supp. 2d 351, 358 (S.D.N.Y. 2010) (dismissing
complaint because it did not plead facts demonstrating defendant's knowledge of
risk).  In other words, in contrast to the cases relied on by Defendants, Cameron's
allegations do not merely rely on that fact that she was assaulted.  (*See generally*
Doc. 1 at 2–5, ¶¶ 10–25.)  Instead, Cameron alleges that she was assaulted because
Defendants exposed her to a serious risk of harm by deliberately placing her in the
male population at SSCF.

Finally, with regard to the objective component, Defendants appear to assert
that placing a transgender female inmate with male inmates cannot demonstrate an
excessive threat to the female transgender inmate.  (Doc. 3 at 13–14; Doc. 6 at
13–14.)  As noted above, however, the Supreme Court has suggested that "a prisoner
can establish exposure to a sufficiently serious risk of harm by showing that he [or
she] belongs to an identifiable group of prisoners who are frequently singled out for
violent attack by other inmates."  *Farmer*, 511 U.S. at 843 (internal quotation marks
omitted).  And both the Supreme Court and the Second Circuit have acknowledged

that, as a transgender female in the general male population, Cameron belongs to such an identifiable group.  *See id.* at 849; *Powell*, 175 F.3d at 115 (stating that "an inmate's . . . transsexualism could place that inmate in harm's way").  Further, this obvious risk to Cameron is supported by DOC policy, which acknowledges that transgender inmates may be particularly vulnerable to assault.  (Doc. 3-3 at 5, ¶ 2; Doc. 6-4 at 5, ¶ 2.)

In sum, viewing the Complaint in the light most favorable to Cameron, she has pled sufficient factual information to plausibly allege that Defendants deliberately failed to protect her from violence at the hands of other prisoners in violation of the Eighth Amendment.  The Court notes, moreover, that many of Defendants' arguments involve factual disagreements that may find support during discovery. For example, as additional facts are established, Defendants may show that the circumstances at SSCF were not actually a substantial risk to Cameron or Defendants may demonstrate that they did not actually "know of the underlying facts indicating a sufficiently substantial danger and that they were therefore unaware of a danger, or that they knew the underlying facts but believed (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent." *Farmer*, 511 U.S. at 844.  At this initial stage, however, Cameron's allegations are sufficient for this Court to draw the reasonable inference that Cameron may be able to establish that Defendants are liable for failing to protect her.

### 2.   Personal Involvement

Defendants also argue that they were not personally involved in the failure to protect Cameron.  As with her failure-to-protect claim, however, this Court concludes that Cameron has plausibly alleged that Defendants were personally involved in the decision to place Cameron in the male population at SSCF.

"[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983."  *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (internal quotation marks omitted).  Personal involvement requires a tangible causal connection between the unlawful conduct and the defendant.  *Tafari v. McCarthy*, 714 F. Supp. 2d 317, 343 (N.D.N.Y. 2010).  That tangible connection may be shown by evidence that:

> (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995).[3]  These categories apply equally if the defendant is a supervisor.  In other words, "[l]iability may not be premised on the

---

[3] In *Grullon v. City of New Haven*, 720 F.3d 133 (2d Cir. 2013), the Second Circuit recognized that "the Supreme Court's decision in *Ashcroft v. Iqbal* . . . may have heightened the requirements for showing a supervisor's personal involvement with respect to certain constitutional violations."  *Id.* at 139; *see also Raspardo v. Carlone*, 770 F.3d 97, 117 (2d Cir. 2014) (declining to decide the "contours of the supervisory liability test . . . after *Iqbal*").  Still, the Second Circuit has not specifically overruled *Colon*, and this Court continues to treat it as good law.  *See, e.g., Jones v. Pallito*, No. 2:14–cv–199, 2015 WL 2376347, at *5 n.9 (D. Vt. May 18, 2015).  In any event, the Court need not reach *Iqbal*'s impact on *Colon* here because Cameron plausibly alleges that Defendants directly participated in the failure to protect Cameron.

*respondeat superior* or vicarious liability doctrines, . . . nor may a defendant be liable merely by his connection to the events through links in the chain of command." *Prince v. Edwards*, No. 99CIV.8650(DC), 2000 WL 633382, at *6 (S.D.N.Y. May 17, 2000) (internal quotations and citation omitted).

Here, although Defendants are supervisors in the DOC hierarchy, Cameron's failure-to-protect claim is not premised solely on their supervisory status.  Instead, Cameron's allegations fall under the first category: she plausibly alleges that Defendants directly participated in the alleged constitutional violation.  "'[D]irect participation' as a basis of liability in this context requires intentional participation in the conduct constituting a violation of the victim's rights by one who knew of the facts rendering it illegal." *Provost v. City of Newburgh*, 262 F.3d 146, 155 (2d Cir. 2001) (footnote omitted).  As discussed above, Cameron claims that, in placing Cameron with SSCF's male population, Defendants deliberately disregarded an unreasonable risk of harm that ultimately led to her assault.  In particular, with regard to Defendants' personal involvement, Cameron asserts that she asked to be lodged with female inmates, but Defendants "denied her request" and "placed [Cameron] with male inmates in a male facility."  (Doc. 1 at 3, ¶¶ 13, 14.)  Further, Cameron alleges that "[d]espite being aware of the threat inmate Francis Lajoice presented to [Cameron], Defendants Potanas and Rutherford placed Lajoice in the cell immediately adjacent [Cameron]."  (*Id.* ¶ 16.)  Accordingly, Cameron's allegations suggest that Defendants directly participated in the constitutional violation by

24

placing Cameron in SSCF, despite their knowledge that a transgender female like Cameron faced an unreasonable risk of harm at SSCF. *See Provost*, 262 F.3d at 155.

Defendants assert that Cameron has not sufficiently alleged that they were personally involved because Defendants cannot "automatically violate[] the Eighth Amendment by housing [Cameron] with inmates who shared her biological sex rather than her gender identity." (Doc. 3 at 19; Doc 6 at 20.) But this argument fails to rebut Cameron's allegations that Defendants were directly responsible for ignoring Cameron's request to be housed with female inmates and for placing Cameron in SSCF.[4] Moreover, Defendants' claims are variations on Defendants' erroneous argument that placing a transgender female inmate with male inmates cannot demonstrate an excessive threat to the female transgender inmate. To the contrary, as the Second Circuit acknowledged, "under certain circumstances the disclosure of an inmate's . . . transsexualism could place that inmate in harm's way." *Powell*, 175 F.3d at 115; *see also Lumumba*, 2014 WL 1516320, at *5 n.3 (noting that "an inmate

---

[4] Indeed, Defendants seemingly disregard Cameron's claims that they directly participated in the alleged constitutional violation, asserting instead that they were not personally involved in enacting a policy or custom that impermissibly housed transgender females with male inmates and, even if they did enact such a policy, they did not know that Cameron faced an unreasonable risk of physical assault if housed with male inmates. (Doc. 3 at 18–19; Doc 6 at 18–19.) This may be true, but such an argument does not address Cameron's allegations that Defendants were personally responsible for placing her in SSCF despite their knowledge that she faced a serious risk as a transgender female.

Moreover, as discussed above, Cameron alleges that officials in the Vermont DOC were generally aware that transgender inmates faced a heightened risk of violence, because DOC Directive 423.01 mandates that transgender individuals be screened and assessed based on the assumption that such transgender inmates may face an enhanced risk and may cause internal security issues. (Doc. 3-3 at 5, ¶ 2; Doc. 6-4 at 5, ¶ 2.) Accordingly, to the extent any policy applies here, the inference is that DOC officials failed to properly classify Cameron as an at-risk inmate when determining her housing placement. Such an inference may establish Defendants personal involvement under the third *Colon* factor.

could show exposure to a sufficiently serious risk of harm if he proved that he belonged to an identifiable group of prisoners who are frequently singled out for violent attack by other inmates" (internal quotation marks omitted)).

Whether those circumstances did, in fact, exist at SSCF and whether Defendants knew of those circumstances are questions of fact better resolved at the summary judgment stage.  Similarly, whether Defendants were, in fact, responsible for ignoring Cameron's request to be housed with female inmates and for placing Cameron in SSCF are questions that may be determined after discovery.

At this stage of the proceedings, however, Cameron has plausibly alleged that Defendants were personally involved in the alleged constitutional violation.

### 3.    Qualified Immunity

Finally, Defendants argue that they are shielded from suit by qualified immunity.  Concluding that the facts asserted in Cameron's Complaint do not provide an adequate basis for qualified immunity, Defendants cannot rely on the affirmative defense in their Motions to Dismiss.

Qualified immunity is an affirmative defense that shields public officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Salahuddin v. Goord*, 467 F.3d 263, 273 (2d Cir. 2006) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  Generally, however, affirmative defenses are asserted in an answer, *see* Fed. R. Civ. P. 12(b), and "*[u]sually*, the defense of qualified immunity cannot support the grant of a [Rule] 12(b)(6) motion for failure to state a claim upon

which relief can be granted." *McKenna v. Wright*, 386 F.3d 432, 435 (2d Cir. 2004) (alterations in original) (quoting *Green v. Maraio*, 722 F.2d 1013, 1018 (2d Cir. 1983)). This is so because the "fate of an official with qualified immunity depends upon the circumstances and motivations of his actions, as established by the evidence at trial," *Green*, 722 F.2d at 1018 (internal quotation marks omitted); merely asserting the defense at an early stage of the pleadings—without the benefit of discovery—does not usually provide an adequate basis for dismissal unless "the defense is based on facts appearing on the face of the complaint." *McKenna*, 386 F.3d at 436 (resolving issue of whether qualified immunity defense may be presented in a Rule 12(b)(6) motion to dismiss).

Accordingly, although qualified immunity should be decided by a court "at the earliest possible stage in litigation," *Hunter v. Bryant*, 502 U.S. 224, 227, "defendants presenting qualified immunity defenses in a pre-answer dismissal motion, rather than on a motion for summary judgment, face a higher burden and must accept the more stringent standard applicable to this procedural route." *Keene v. Schneider*, No. 207-CV-79, 2007 WL 2463270, at *3 (D. Vt. Aug. 28, 2007). "Not only must the facts supporting the defense appear on the face of the complaint, but, as with all Rule 12(b)(6) motions, the motion may be granted only where 'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief.'" *McKenna*, 386 F.3d at 436 (quoting *Citibank, N.A. v. K–H Corp.*, 968 F.2d 1489, 1494 (2d Cir.1992)). "Thus, the plaintiff is entitled to all reasonable

inferences from the facts alleged, not only those that support his claim, but also those that defeat the immunity defense." *Id.*

With this stringent standard in mind, the Court turns to the qualified immunity analysis, which contains two steps.  The first inquiry is whether the plaintiff has plausibly alleged that the public official's conduct violated a constitutional right.  *Salahuddin*, 467 F.3d at 273.  Second, the court must ascertain whether the right was clearly established and, if so, whether the defendant's actions were objectively unreasonable in the light of this clearly established precedent.  *Id.*; *see also In re State Police Litig.*, 88 F.3d 111, 123 (2d Cir. 1996) ("A right whose existence is indicated by prior case law with reasonable specificity is clearly defined within the meaning of this doctrine." (internal quotation marks omitted)).

Here, as discussed in detail above, Cameron has met the first requirement by plausibly alleging that Defendants failed to protect Cameron in violation of the Eighth Amendment.  With regard to whether the right was clearly established, since *Farmer v. Brennan*, the U.S. Supreme Court has made plain that prison officials have "a duty to protect prisoners from violence at the hands of other prisoners." 511 U.S. at 833.  That duty is violated where the official is "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and [the official] . . . draw[s] the inference."  *Id.* at 837.  A prison official's requisite awareness may be established simply because the risk to the prisoner was obvious, *id.* at 842; and, moreover, a prisoner may be exposed to a sufficiently serious risk of harm simply by belonging "to an identifiable group of prisoners who are frequently singled

out for violent attack by other inmates." *Id.* at 843 (internal quotation marks omitted).  More to point, in *Farmer*, the Supreme Court acknowledged that placing a transsexual prisoner with feminine characteristics in general population could pose a significant threat to internal security in general and to the prisoner in particular. *Id.* at 849; *see also Powell*, 175 F.3d at 115.  Accordingly, taking Cameron's allegations as true, it is readily apparent that it would be unlawful in light of *Farmer* for Defendants to place Cameron, as a transgender female, in the general male population at SSCF with deliberate indifference to the serious risk of harm she faced.

Defendants protest that "[Cameron] has not articulated . . . any clearly established law that requires inmates to be housed in accordance with their gender identity."  (Doc. 3 at 25 n.98; Doc. 6 at 26 n.14.)  Although Defendants are correct that the Supreme Court has not recognized such a particularized right, the Supreme Court's holding in *Farmer* indicates "with reasonable specificity" that a prison official may violate a female transgender prisoner's constitutional rights if the official deliberately ignores an excessive risk to that prisoner's safety by placing the prisoner in the general male population.  *In re State Police Litig.*, 88 F.3d at 123.  Again, as noted above, whether Defendants had the requisite knowledge is a question of fact more easily resolved at the summary judgment stage, as is the question of whether Defendants responded reasonably to the risk posed to Cameron.  Indeed, in one of the cases relied on by Defendants, the Northern District of New York concluded that summary judgment should be granted in favor of the prison officials because there was "insufficient evidence" to suggest that the prison officials were personally

responsible for classifying transgendered inmates or that the transgendered inmates were actually at risk. *Wilson v. David*, No. 9:08-CV-618, 2010 WL 610714, at *5 n.5 (N.D.N.Y. Feb. 17, 2010). At this point, however, it does not appear "beyond doubt" that no set of facts may be established that would entitle Cameron to relief. *McKenna*, 386 F.3d at 436.

As a result, the facts asserted in Cameron's Complaint do not provide an adequate basis for Defendants to be shielded by qualified immunity.

### C.   Failure to Train or to Supervise

The Court next turns to Cameron's second and third causes of action, in which Cameron alleges that Defendants are liable under the Eighth Amendment for failing to adequately train and supervise the correctional officers at SSCF, causing unconstitutional conditions that constituted a substantial risk to the health and safety of the SSCF inmates, including Cameron. (Doc. 1 at 5–7, ¶¶ 26–39.) Because Cameron does not causally link her eventual assault with Defendants' alleged failure to train or supervise the correctional officials at SSCF, both causes of action should be dismissed.

As discussed above, in a § 1983 action, "supervisory liability is a misnomer" because liability must be premised on the supervisor's individual actions. *Kucera v. Tkac*, No. 5:12-CV-264, 2013 WL 1414441, at *4 (D. Vt. Apr. 8, 2013). Specifically, "[s]upervisory liability . . . is 'imposed against a supervisory official in his individual capacity for his own culpable action or inaction in the training, supervision, or control of his subordinates.'" *Odom v. Matteo*, 772 F. Supp. 2d 377, 403 (D. Conn. 2011)

(quoting *Clay v. Conlee*, 815 F.2d 1164, 1170 (8th Cir. 1987)); *Iqbal*, 556 U.S. at 676 ("[A] plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution.").  Although a supervisor's personal involvement may generally be established by evidence satisfying one of the five *Colon* factors, *see* 58 F.3d at 873,[5] at bottom, personal involvement requires a tangible causal connection between the unlawful conduct and the defendant.  *Tafari*, 714 F. Supp. 2d at 343; *see also Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986) ("A plaintiff must thus allege a tangible connection between the acts of a defendant and the injuries suffered.").

Here, Cameron's allegations do not establish that connection.  In Counts Two and Three, Cameron asserts that, "[a]s policymakers," Defendants "were responsible for training" and that they "failed to adequately train the Southern State Correctional Facility deputies, which caused unconstitutional conditions."  (Doc. 1 at 5, ¶¶ 28, 29.)  Similarly, Cameron alleges that, "[as] policymakers," Defendants "failed to adequately supervise the Southern State Correctional Facility deputies, which caused unconstitutional conditions."  (*Id*. at 6, ¶¶ 35, 36.)  In addition,

---

[5] As a reminder, the five *Colon* alternatives are as follows:

(1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995).

Cameron generally asserts that she was "ridiculed, threatened[,] and harassed by . . . correctional officers throughout her stay at Southern State Correctional Facility." (*Id.* at 3, ¶ 15.)

But these generalized claims that SSCF correctional officers threatened and harassed Cameron fall far short of rising to the level of conduct that violates the Eighth Amendment, nor does Cameron's Complaint describe how the correctional officers' alleged behavior caused her assault. *See Sims v. Artuz*, 230 F.3d 14, 22 (2d Cir. 2000) (stating that not every push or shove violates a prisoner's constitutional rights); *Aziz Zarif Shabazz v. Pico*, 994 F. Supp. 460, 474 (S.D.N.Y. 1998) (finding no constitutional violation by even the most reprehensible verbal harassment or profanity).  Rather, as discussed in detail above, Cameron's injury was caused by another inmate—Lajoice—and the gravamen of Cameron's Complaint is that, as a transgender female, being placed among the male inmates at SSCF created an unreasonable risk of harm that ultimately led to that injury.  In fact, Cameron's Complaint does not name a single correctional officer at SSCF, let alone specific correctional officers whose actions created the purportedly unconstitutional circumstances leading to Cameron's assault.  Absent such allegations, nothing in Cameron's Complaint connects her assault to acts or omissions committed by the SSCF correctional officers; accordingly, this Court cannot infer a causal connection between Cameron's injury and Defendants' alleged training and supervision of the SSCF correctional officers.  *Rahman v. Fisher*, 607 F. Supp. 2d 580, 584 (S.D.N.Y. 2009) ("A defendant's conduct must be a proximate cause of the claimed

[constitutional] violation in order to find that the defendant deprived the plaintiff of his rights.").

Similarly, although Cameron asserts that Defendants were "policymakers" (Doc. 1 at 5, 6, ¶¶ 28, 35), Cameron has not sufficiently alleged that the conditions in the prison were fostered by a larger policy or custom put in place or sanctioned by Defendants, nor has Cameron plausibly claimed that Defendants' gross negligence over their subordinates caused those conditions. *See Plair v. City of New York*, 789 F. Supp. 2d 459, 466 (S.D.N.Y. 2011). It is insufficient to label Defendants as "policymakers" or to merely state that Defendants were responsible for training and supervising correctional officers. *Parris v. N.Y. State Dep't of Corr. Servs.*, 947 F. Supp. 2d 354, 364 (S.D.N.Y. 2013) ("Conclusory, unsupported allegations of gross negligence or the existence of a policy are simply insufficient to establish liability of supervisory prison officials under § 1983." (internal quotation marks omitted)); *Rosario v. Fischer*, No. 11 Civ. 4617 (JPO)(FM), 2012 WL 4044901, at *9 (S.D.N.Y. Aug. 28, 2012) (stating that conclusory allegations of creating or fostering unconstitutional practice are insufficient to establish personal involvement).

Finally, the facts asserted in Cameron's Complaint fall far short of supporting a conclusion that Defendants had the requisite knowledge necessary to establish liability under the Eighth Amendment. Cameron claims that Defendants were "on notice" that their failure to train and supervise the correctional officers caused unconstitutional conditions at SSCF. (Doc. 1 at 5, 7, ¶¶ 30, 37.) But mere "notice" of unidentified unconstitutional conditions caused by the SSCF officers does not amount

to deliberate indifference.  *See Farmer*, 511 U.S. at 836.  As a factual matter, moreover, Cameron's Complaint does not describe how Defendants received notice of the allegedly unconstitutional acts by SSCF officers, nor does the Complaint describe the allegedly unconstitutional conditions caused by correctional officers at SSCF. Without such allegations, the Court cannot reasonably infer that Defendants were on notice of constitutional violations by correctional officers such that Defendants' inaction could be seen as "deliberate indifference to the possibility that . . . subordinates would violate [Cameron's] constitutional rights." *Pettus v. Morgenthau*, 554 F.3d 293, 300 (2d Cir. 2009).

Put simply, Cameron's second and third causes of action are entirely conclusory because Cameron fails to allege any facts from which this Court can infer that Defendants' failure to train and supervise the SSCF correctional officers caused Cameron's assault.  Accordingly, the Court should dismiss those claims.

### D.    State-Law Claims

The Court next turns to Cameron's state-law claims, which Cameron raises under the auspices of supplemental jurisdiction.  *See* 28 U.S.C. § 1367.  Cameron first asserts that Defendants were negligent because their "actions were a breach of the applicable standards of care requiring the placement of transgender females with other females."  (Doc. 1 at 7, ¶ 42.)  Cameron also claims that she was falsely imprisoned by Defendants when they extended her period of incarceration beyond her minimum sentence.  (*Id.* at 8, ¶ 44.)  For the reasons set forth below, Defendant Menard is shielded from both of Cameron's state-law claims by the doctrine of official

immunity.  Moreover, pursuant to Vt. Stat. Ann. tit. 12, § 5601(a), the Vermont
Superior Courts have exclusive jurisdiction over lawsuits resulting from state
employee torts.  As a result, Cameron's negligence and false-imprisonment claims
brought against Defendants must be dismissed.

### 1.    Menard's Official Immunity

As a matter of law, Defendant Menard is entitled to absolute immunity to both
state-law claims under the state-law doctrine of "official immunity."  *Curran v.
Marcille*, 152 Vt. 247, 249, 565 A.2d 1362, 1363 (1989).  Official immunity shields
Vermont's "highest executive officers in cases where the acts complained of were
performed within their respective authorities."  *Id.* (internal quotation marks
omitted).  Further, the Vermont Supreme Court has previously held that the
Commissioner of the DOC is among the state's highest executives for the purpose of
official immunity.  *Id.*  Here, Cameron complains that Menard, in her role as
Commissioner, negligently placed Cameron within the male population of SSCF and
falsely imprisoned Cameron beyond her minimum sentence date.  Because these acts
fell within Menard's official authority as the former DOC Commissioner, Menard is
shielded by official immunity from both of Cameron's state-law claims.

### 2.    Sovereign Immunity

Moreover, the state-law claims that Cameron asserts against Defendants are
precluded by Vermont's sovereign immunity.  "The [Vermont Tort Claims Act
(VTCA)] constitutes only a limited waiver of Vermont's sovereign immunity; it allows
lawsuits resulting from state employee torts to be brought '(1) solely against the

35

State of Vermont and (2) exclusively in Vermont superior courts.'" *Jones v. Pallito*,
No. 2:14-CV-199, 2015 WL 2376347, at *10 (D. Vt. May 18, 2015) (quoting *Rheaume
v. Tallon*, No. 1:07-CV-262, 2009 WL 385422, at *2 (D. Vt. Feb. 12, 2009); *see also*
Vt. Stat. Ann. tit. 12, §§ 5601(a), 5602(a)).  In this case, Cameron does not assert her
state-law claims against the state as required by Vt. Stat. Ann. tit. 12, § 5601(a);
instead, she brings her claims against Defendants, who are all state employees.
Further, as this Court has previously stated, the VTCA does not waive Vermont's
sovereign immunity such that a state employee may be sued for negligence or false
imprisonment in federal court.[6]  *Breer v. Gold*, No. 2:03–CV–326, 2009 WL 249648,
at *7 (D. Vt. Feb.3, 2009) ("[T]he [VTCA] does not waive Vermont's sovereign
immunity such that plaintiffs may sue state employees for negligence in federal
court."); *Winfield v. Trottier*, No. 2:08-CV-278, 2009 WL 2160588, at *2 (D. Vt. July
15, 2009) (stating that plaintiff's negligence and false-imprisonment claims would
survive a motion to dismiss only if they alleged gross negligence of willful
misconduct).  Instead, pursuant to Vt. Stat. Ann. tit. 12, § 5601(a), exclusive
jurisdiction for such actions rests with the Vermont superior courts.  Accordingly, the
negligence and false-imprisonment claims that Cameron asserts against Defendants
must be DISMISSED, without prejudice.

---

[6] Although the exclusive jurisdiction of the Vermont superior courts does not apply to "gross
negligence or willful misconduct" by state employees, Vt. Stat. Ann. tit. 12, § 5602(b), as Cameron's
counsel conceded during the hearing, Cameron's Complaint does not raise allegations of gross
negligence.

## Conclusion

For the reasons set forth above, I recommend that the Court decline to take judicial notice of Cameron's *nolo contendere* plea transcript and that the Court exclude the plea transcript from the record.  Further, given that the plea transcript may be excluded for failure to satisfy the judicial notice standard, I recommend that Cameron's Motion to Strike be DENIED as moot.  (Doc. 11.)  With respect to the merits of Cameron's claims, because Cameron has plausibly alleged that Defendants failed to protect her in violation of the Eighth Amendment, Defendants' Motions to Dismiss that claim should be DENIED.  (Doc. 3 at 9–20; Doc. 6 at 9–20.)  With respect to Cameron's remaining claims—that Defendants failed to adequately train and supervise the SSCF correctional officers and that Defendants are liable for negligence and false imprisonment—I recommend that the Court GRANT Defendants' Motions to Dismiss.  (Doc. 3 at 21–28; Doc. 6 at 21–28.)

Dated at Burlington, in the District of Vermont, this 13th day of August 2019.

/s/ John M. Conroy
John M. Conroy
United States Magistrate Judge

Any party may object to this Report and Recommendation within 14 days after service thereof, by filing with the Clerk of the Court and serving on the Magistrate Judge and all parties, written objections which shall specifically identify those portions of the Report and Recommendation to which objection is made and the basis for such objections.  *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b)(2); L.R. 72(c).  Failure to timely file such objections "operates as a waiver of any further judicial review of the magistrate's decision."  *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15, 16 (2d Cir. 1989).