U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2024 DEC 19 PM 3: 06

BY_____
DEPUTY CLERK

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

DAVID "CAMMIE" CAMERON,              )
                                     )
        Plaintiff,                   )
                                     )
    v.                               )       Case No. 5:18-cv-204
                                     )
LISA MENARD, Commissioner, Vermont   )
Department of Corrections, MARK      )
POTANAS, Former Superintendent,      )
Southern State Correctional Facility, and )
JOSHUA RUTHERFORD, Chief of          )
Security, Southern State Correctional )
Facility,                            )
                                     )
        Defendants.                  )

**OPINION AND ORDER**
**(Docs. 71, 78, 84)**

Plaintiff David "Cammie" Cameron, a transgender woman who was incarcerated at the

relevant times, filed this civil rights lawsuit seeking to hold the above-captioned Vermont

Department of Corrections (DOC) officials liable for injuries that she sustained in an altercation

with another inmate on December 21, 2015. (*See* Doc. 1.) The court previously dismissed all of

Plaintiff's claims except for her claim under 42 U.S.C. § 1983 that Defendants failed to protect

her in violation of the Eighth Amendment. (*See* Docs. 18, 19.)

After a lengthy period of discovery, Defendants filed motions for summary judgment.

(Doc. 71 (Defendant Potanas); Doc. 78 (Defendants Menard and Rutherford).) The Magistrate

Judge issued a Report and Recommendation (R&R), recommending that the court grant both

motions. (Doc. 84.) Plaintiff has filed objections to the R&R, requesting that the court deny

both summary judgment motions. (Doc. 85.) Defendants have filed responses in opposition.

(Doc. 86 (Defendant Potanas); Doc. 87 (Defendants Menard and Rutherford).)

For the reasons discussed below, the R&R is ADOPTED and Defendants' Motions for Summary Judgment are GRANTED.

## Background

The R&R includes a detailed statement of facts based primarily on the parties' Rule 56 statements and the documents cited in those statements. (Doc. 84 at 2–6.) The R&R notes that Plaintiff's responses to Defendants' Statements of Undisputed Facts "do not fully comply" with Fed. R. Civ. P. 56(c) and Local Rule 56 because some portions of Plaintiff's responses lack evidentiary support for critical facts and because the responses include "novel assertions of fact which may or may not have any relation to the paragraph to which they are nominally responding." (*Id.* at 11–12.) In addition to those issues, Plaintiff's response to Potanas's Rule 56 statement includes a "Statement of Undisputed Material Facts" (Doc. 79-1 at 22–31), which is not authorized under the Local Rules—*see High Mountain Corp. v. MVP Health Care, Inc.*, 592 F. Supp. 3d 325, 333 (D. Vt. 2022)—and contrary to the court's instruction that Plaintiff file "only those documents permitted under Local Rule 7 and 56: a motion, a memorandum, and a statement of *disputed* material facts." (Doc. 76 (emphasis added).)

Despite the issues in Plaintiff's Rule 56 filings, the R&R proceeds to analyze the merits of Defendants' motions based upon a review of the entire record. (Doc. 84 at 14.) The court does the same here as part of its review of the R&R. Notably, the R&R acknowledges at the outset that under Rule 56 the court is required to draw all inferences in Plaintiff's favor. (Doc. 84 at 2.) A significant portion of Plaintiff's objections to the R&R is a list of 11 instances (numbered 3a through 3k) where, according to Plaintiff, the R&R improperly draws inferences in favor of Defendants. (*See* Doc. 85 at 1–3.) Of those 11 instances, only number 3g cites the

portion of the R&R that sets forth the factual background.  (*Id.* at 3, ¶ 3g.)[1]  The extent to which

Plaintiff objects to other aspects in the R&R's recitation of the facts is therefore not entirely

clear.  Out of an abundance of caution, the court reviews those facts here, together with

additional facts drawn from the court's examination of the record and materials that are subject

to judicial notice.  The court has taken care to include facts relevant to each of the 11 instances

outlined in Plaintiff's Objections.

**The Defendants**

Defendant Lisa Menard was appointed DOC Commissioner in September 2015 and was

serving in that capacity at all relevant times thereafter.  (*See* Doc. 78-4 at 15.)  At the time of the

December 2015 incident, Defendant Joshua Rutherford was the security and operations

supervisor at the DOC's Southern State Correctional Facility (SSCF) in Springfield, Vermont.

(Doc. 78-5 at 22–23.)  Defendant Mark Potanas was the Superintendent of SSCF at all relevant

times.  (*See* Doc. 72-6 ¶ 1.)

SSCF is an "all-male" facility.  (*See* Doc. 72-3 at 13; Doc. 78-5 at 27.)  At the relevant

times, SSCF had 350–400 inmates and approximately 134 state employees plus 60 contractors.

(Doc. 72-3 at 7.)  At all relevant times, DOC's Chittenden Regional Correctional Facility

(CRCF) was Vermont's only facility for incarcerated women.  (*See* Doc. 84 at 4 n.3; *see also*

Doc. 72-3 at 26 (noting that CRCF was previously a "male facility"); Doc. 78-5 at 90 (discussing

CRCF as a facility that houses female inmates).)

---

[1] Paragraph 3g concerns evidentiary support (or lack thereof) as to a multidisciplinary team that decided to place Plaintiff in the facility's medical unit.  The court reviews that issue below.

**Plaintiff's Incarceration at MVRCF and Transfer Request**

For several months before May 2015, Cameron was incarcerated at DOC's Marble

Valley Regional Correctional Facility (MVRCF) in Rutland, Vermont, serving time for a crime

of breaking and entering. (*See* Doc. 72-2 at 9–12.) In March 2015, Cameron signed a DOC

"Gender Identification Preference Form" indicating that she identified as transgender and that

she was requesting "no accommodations." (Doc. 72-4 at 2.)[2] That form was one of the specific

requirements of a new February 2015 DOC policy relating to the treatment of inmates who

identify as members of the Lesbian, Gay, Bisexual, Transgender, Queer, Questioning and

Intersex (LGBTQI) community. State of Vt., Agency of Hum. Servs., Dep't of Corr., "Gender

Identification, Care, and Custody," No. 432.01 at 5 (effective Feb. 22, 2015) [hereinafter

"Policy 432.01"], https://outside.vermont.gov/dept/DOC/Policies/Gender%20Identification,

%20Care,%20and%20Custody%20Directive.pdf [https://perma.cc/Q2LN-98R9].

Cameron received two disciplinary reports (DRs) while at MVRCF, causing her to lose

"good time" credit and the opportunity to participate in work camp. (Doc. 72-2 at 9–11.) She

concluded that if she was not receiving "good time," then she did not want to stay at MVRCF;

she requested a transfer to a different facility. (*Id.* at 11.)

Cameron testified that she did not expect DOC to send her to SSCF because of a prior

"incident" she had with a correctional officer (CO) there. (*Id.*) There is no evidence that her

request to be transferred from MVRCF included a request not to be placed at SSCF or a request

to be placed at any particular facility (including at a female facility). Her transfer request was

---

[2] In her response to Menard and Rutherford's Rule 56 statement, Plaintiff asserts, without citing evidence, that she "was never provided with any information from DOC regarding what accommodations were available to her to request." (Doc. 81-1 at 2, ¶ 3.) The form that she signed, however, noted that accommodation requests included items such as bras, boxer shorts, and hygiene items. (Doc. 72-4 at 2.)

4

granted, and she was transferred to SSCF. (*Id.*) None of the defendants were involved in DOC's decision to place Cameron at SSCF. (Doc. 72-3 at 13; Doc. 78-4 at 60; *see also* Doc. 78-5 at 71–72 (listing Rutherford's responsibilities as security and operations supervisor, none of which included determining which individuals are placed at SSCF)); *see also* Policy 432.01 at 8 ("All determinations regarding the housing of a transgender . . . inmate will be made by a management team consisting of the Director of Correctional Facilities; the Health Services Director; the Corrections Case Work Director; and a DOC employee with the ability and knowledge needed to represent LGBTQI interests.").[3]

**Events Before Plaintiff's Arrival at SSCF**

Superintendent Potanas testified that housing a transgender woman was "a new experience for the facility and the department." (Doc. 72-3 at 7.) He testified that SSCF staff received emails notifying them "that the first transgender female was coming to the facility." (*Id.*) He testified that he was not aware of any open hostility among the SSCF staff against transgender female inmates and that he was not concerned about the staff's ability to treat Plaintiff with dignity and respect. (*Id.*) When asked whether he was concerned about the other inmates' ability to treat Plaintiff with dignity and respect, he replied that he was "[a]lways concerned about the inmates' ability to do anything." (*Id.*) Potanas conceded that, at the time he was SSCF Superintendent in 2015, he was concerned "that transgender female inmates were at greater risk of physical and sexual assault in a male facility as compared to the general population." (*Id.* at 8.)

---

[3] Plaintiff objects to an alleged "inference" in the R&R that Defendants "had no involvement in the placement of Plaintiff at SSCF." (Doc. 85 at 3, ¶ 3i.) The court concludes that no evidence or inference supports a conclusion that any defendant was involved in the decision to select SSCF as the facility to which Cameron would be transferred.

Potanas testified that his job as SSCF Superintendent required him to "enforce DOC policies and directives as written" (*id.* at 4), including implementation of Policy 432.01 (*id.* at 8). Policy 432.01 specifies "Procedural Guidelines" regarding "Classification and Housing" for LGBTQI inmates, including the following:

    a.    DOC will not classify inmates solely on the basis of their LGBTQI status or perceived LGBTQI status.

    b.    DOC will respond to abuse or harassment (or threat of abuse or harassment) of LGBTQI inmates or residents by considering the individual circumstances of the situation, and in a manner consistent with the facility rules and inmate discipline detailed by Directive #410.01. DOC will not rely on the isolation or segregation of LGBTQI inmates or residents in these situations and will resort to this method only if necessary to assure safety and security.

    c.    LGBTQI inmates will not be placed in segregation housing due to the sole purpose [sic] of their gender identity or status. . . .

    d.    Whenever an inmate is identified as transgender . . ., the facility multi-disciplinary team will meet within seventy-two hours of the inmate's arrival or intake and conduct a review in order to assess the on-going and long-term medical, psychological and facility needs of the individual . . . .

    e.    LGBTQI inmates will not be placed in dedicated facilities, units, or wings solely on the basis of such identification or status, unless such placement is in a dedicated facility, unit, or wing established in connection with a consent decree, legal settlement, or legal judgment for the purpose of protecting such inmates. . . .

    j.    DOC can house transgender . . . inmates according to their gender identity rather than their birth sex. In deciding whether to assign [a] transgender . . . inmate to a facility for male or female inmates, and in making other housing . . . assignments, DOC will consider on a case-by-case basis whether a placement would ensure the inmate's health and safety, and whether the placement would present management or security problems.

Policy 432.01 at 7–8. Many of these requirements appear to be drawn from and consistent with the requirements of the federal regulations implementing the Prison Rape Elimination Act (PREA). *See* 28 C.F.R. § 115.42. The federal regulations require "individualized determinations about how to ensure the safety of each inmate" and require the agency to give "serious

consideration" to a transgender inmate's own views with respect to his or her safety. *Id.*

§ 115.42(b), (e).

**Placement at SSCF's Medical Unit**

According to Potanas's affidavit, when Cameron arrived at SSCF, a "multi-disciplinary

team"[4] at the facility decided to place her at SSCF's medical unit "in part for her own safety,

because of her transgender identification and because Charlie Unit [the medical unit] had single

cells." (Doc. 72-6 ¶¶ 2, 4.)  In response to Menard's and Rutherford's Rule 56 statement,

Plaintiff sought to dispute Potanas's testimony on those points, asserting that "[t]hroughout the

course of discovery, Defendants have not provided a shred of documentary evidence" either "that

a multidisciplinary team was ever convened to address Plaintiff's incarceration at SSCF" or

"stating the reasoning or decision making that went into Plaintiff being placed in Charlie Unit."

(Doc. 81-1 ¶¶ 11, 13.)  Similarly, in her objection to the R&R, Plaintiff asserts that there is "no

deposition testimony existing regarding [the MDT's] proceedings, no roster of the members of

the committee existing, and no documentary evidence of any kind being disclosed to Plaintiff"

on this topic.  (Doc. 85 at 3(g).)

Potanas testified that documentation of MDT meetings was "weak, at best."  (Doc. 72-3

at 10.)  However, even though the court is required to draw all factual inferences in Plaintiff's

favor (*see* Doc. 84 at 10–11 and cases cited), the apparent absence of documentation regarding

the MDT's proceedings does not prove that the R&R drew any improper inference regarding the

---

[4] Policy 432.01 does not define "multi-disciplinary team."  A current DOC glossary
defines a "Multi-Disciplinary Team" (MDT) as "[a] team comprised of the Superintendent or
designee, and representatives from casework staff, facility management and security, and the
contracted healthcare provider."  Dep't of Corr., Glossary of Terms,
https://outside.vermont.gov/dept/DOC/Policies/Department%20of%20Corrections%20Glossary
%20of%20Terms.pdf [https://perma.cc/4D7W-W3EV].

MDT. Potanas testified that he was on the MDT and that the MDT discussed Cameron and made the decision to place her in the medical unit based "in part for her own safety, because of her transgender identification and because Charlie Unit had single cells." (Doc. 72-3 at 10; Doc. 72-6 ¶¶ 2, 4, 5.)[5] Rutherford testified that he was on the MDT and that the team met before and after Cameron's arrival at SSCF. (Doc. 78-5 at 60.) Cameron has not offered any evidence to the contrary.[6] The court concludes that the absence of documentary evidence corroborating Potanas's testimony does not rise to the level of "specific" evidence, as necessary to establish a genuine dispute of material fact on these issues. *Robinson v. Concentra Health Servs., Inc.*, 781 F.3d 42, 44 (2d Cir. 2015).

Cameron understood that she was placed in the medical unit for her safety and—at least initially—did not object to that placement. (Doc. 72-2 at 13.) It is undisputed that SSCF's medical unit was "a two tier general population living unit, primarily for inmates with medical issues and elders, consisting of single occupancy cells." (Doc. 72-6 ¶ 3.) "Generally, inmates housed in Charlie Unit were deemed to be a low or very low risk of safety to staff or other inmates." (*Id.*)

Charlie Unit had cameras in it, but, according to Rutherford, "[w]hether or not those cameras captured a specific area, for instance, within or in the doorway of a given cell, is going

---

[5] The record indicates that Cameron has received disability benefits due to a traumatic brain injury resulting from a suicide attempt in or about 2002, and that she has struggled with narcotic drug use. (Doc. 72-2 at 4–5.) But it appears to be undisputed that Cameron's placement in SSCF's medical unit was not based on any need for medical treatment at that time.

[6] In her response to Potanas's Rule 56 statement, Plaintiff does not dispute that "[t]he decision to place Cameron in Charlie Unit was made by a multi-disciplinary team at SSCF comprised of management, caseworkers, mental health professionals, medical professionals, security personnel and Superintendent Potanas." (Doc. 79-1 ¶ 13.) In response to the other defendants' Rule 56 statement, Plaintiff purports to dispute the same assertion, but cites no evidence in support. (Doc. 81-1 ¶ 13.)

8

to depend on the cameras and the angles and where a specific camera that's movable is pointed at that juncture." (Doc. 78-5 at 44.) All of the cells in the medical unit had solid doors with a window. (Doc. 72-2 at 15.) Inmates in the medical unit could congregate in a common area. (*Id.*) While housed in Charlie Unit, Cameron was assigned to cell #24 on the second floor. (*Id.* at 14.)

**Events at SSCF Before the Altercation**

DOC records indicate that Cameron arrived at SSCF in late May 2015. (Doc. 79-10 at 3.) Soon after her arrival she informed one of the staff members that the last time she was at SSCF "it was a terrible experience with staff as they were not accepting her change" to female and that she "felt singled out." (*Id.*) During intake and orientation on May 28, 2015 (*see id.*), Cameron signed an "Offender/Inmate Orientation to ADA" form indicating that "[a]t this time I do *not* request a reasonable accommodation" under the Americans with Disabilities Act. (Doc. 72-5.)

Facility notes indicate that, on or about August 26, 2015, Cameron stated to SSCF staff or medical personnel that she was "tired of this place and that certain officers were giving her a hard time." (Doc. 79-10 at 4.) On the evening of September 5, 2015, Cameron called the DOC investigations hotline, stated that she identifies as transgender, and that she was "having difficulties at SSCF." (Doc. 79-10 at 5.) Cameron offered "[n]o specifics" during that call but requested to speak with someone as soon as possible. (*Id.*) DOC staff sent an email to Potanas and Rutherford advising them of Cameron's call to the hotline. (*Id.*)

On the evening of September 6, 2015, supervisor Michael Groner sent an email documenting a call from a nurse indicating that Cameron "had been speaking with her about staff and inmates making inappropriate comments to her [Cameron] on a fairly consistent basis." (*Id.*

at 6.) The nurse advised that Cameron "appeared to be in a fairly distressed state." (*Id.*) In response, Groner met with Cameron, who then made the following allegations:

> She claims that COI Mckee harasses her constantly. When he [is] assigned to main control, Mckee calls Peterson in Charlie unit and requests that he pat her down when she returns from rec often. Cameron claims that the last time she was in fox trot that Mckee called her "Dave" a number of times during the same shift and on multiple shifts. Cameron feels he did this on purpose.
>
> Cameron also claims that Mckee harassed her while she was using the inmate bathroom in education while he was touring education. She could not provide me with specific dates for the education occurrence.
>
> She also claimed that COI Nieves made disparaging remarks about the trans gender population in her presence, again no specific date given.
>
> She also claimed that while exiting the DEF building, multiple inmates in F2 yelled out their window "show us your tits". COII Mackenzie was nearby and allegedly laughed at the comments in Cameron's presence.

(Doc. 79-10 at 6.) Groner wrote that he did not know Cameron very well, "so I don't know how manipulative she is," but that "[s]he did mention she wanted to go to a different facility and she wanted her good time back that she lost from DR's, so there does appear to be an alter[n]ative motive behind these complaints." (*Id.*)

Forwarding Groner's email, Potanas directed Rutherford and Assistant Superintendent Michaela Merrill that "[o]ne of you needs to start an investigation on this ASAP." (*Id.*)[7] Rutherford does not remember instituting any investigation himself or whether an investigation occurred. (Doc. 78-5 at 82.) He noted that Potanas's email was also directed to Michaela Merrill and SSCF's other assistant superintendent, but he does not recall who might have conducted any investigation. (*Id.*) Rutherford further testified that "[i]f an investigation was

---

[7] The court notes here that policies implementing the Prison Rape Elimination Act (PREA) required DOC to "ensure that an administrative or criminal investigation is completed for all allegations of sexual abuse and sexual harassment." 28 C.F.R. § 115.22(a).

conducted, there should have been a written document generated from that." (*Id.* at 83.) No

such written document appears in the record in this case.

On or about September 12, 2015, Cameron filed a grievance in which she stated:

> I am grieving the fact that DOC is intentionally isolating me by keeping me in a single cell for my "safety" and separating me from any inmate that I befriend. I am being not only profiled and segregated but am being emotionally tortured. I plan on contacting a lawyer and pursuing any action I can to hold DOC responsible for this!

(Doc. 72-7 at 2.) Potanas states in his affidavit that the MDT decided to keep Cameron in the

medical unit over her objection "in part for her safety." (Doc. 72-6 ¶ 5.)[8]

Cameron submitted another grievance on or about September 15, 2015. She complained

that CO Brooks referred to her improperly, calling her "she or he or whatever." (Doc. 72-2

at 15; Doc. 78-5 at 94.) Cameron also submitted a grievance on December 4, 2015, regarding an

incident when another inmate pulled down the shower curtain while she was showering. (*Id.*

at 96.)

On or about December 2, 2015, Cameron wrote a letter to Commissioner Menard stating,

in pertinent part:

> I am a 32 year old transgender female and am currently on hormones and have been for a little over eight years. . . . Time has been more than a little difficult to deal with since I've been incarcerated. I not only have long hair and female facial features but I have developed breasts. I not only receive ridicule and complete disrespect from other inmates on a daily basis but also receive unfair treatment from the officers that work here.

---

[8] Plaintiff's Rule 56 statements include inconsistent statements as to whether she disputes this fact. (*Compare* Doc. 79-1 ¶¶ 22–23 *with* Doc. 81-1 ¶¶ 25–26.) In any case, as above, the court concludes that the absence of documentary evidence corroborating Potanas's testimony does not rise to the level of "specific" evidence necessary to establish a genuine dispute of material fact on this issue.

(Doc. 79-10 at 2.) She requested that her good time credit be restored so that she "would be [eligible] to max out some time in February." (*Id.*) The letter bears a stamp indicating that it was received in the Commissioner's office on December 7, 2015. (*Id.*)

> A few days later, Cameron sent another letter to Commissioner Menard stating:
>
> I have recently . . . sent you a letter describing my hardships while incarcerated. If my good time is not going to be given to me collectively [then] I am wondering if I can be housed in Chittenden Correctional facility? It is stated in the directive 432.01 that transgender inmates shall be housed according to their gender identifi[c]ation. I firmly believe that this move would alleviate the major emotional difficulties that I have been enduring.

(Doc. 78-16 at 2.) Although Policy 432.01 does not require DOC to assign transgender inmates according to their gender identity, *see* Policy 432.01 at 8, the policy permits such assignments, and Cameron's letter was a request to be assigned to CRCF, Vermont's female facility. The Commissioner's office received this second letter on December 10, 2015. (Doc. 78-16 at 2.)

Menard testified at her December 2021 deposition—taken after she retired—that she did not recall seeing or reading either of Cameron's December 2015 letters while she was serving as DOC Commissioner. (*See* Doc. 78-4 at 41, 44.) Potanas and Rutherford similarly testified that they did not see either of the December 2015 letters until after the altercation of December 21, 2015. (*See* Doc. 72-3 at 20–21; Doc. 78-5 at 87–91.)

Without citing a specific day or time, Cameron states in her affidavit that, before the altercation, she had "conversations" with Rutherford informing him that she "did not feel safe due to the constant verbal abuse [she] was receiving, which were frequently sexually threatening in nature." (Doc. 81-5 ¶ 5.) She also states that she informed Rutherford before the altercation that she wanted to be transferred to an all-women's facility "where I felt I would be safer and subjected to less frequent abuse." (*Id.* ¶ 6.) According to Plaintiff, Rutherford responded: "That's not going to happen." (*Id.*)

**Francis Lajoice**

Inmate Francis Lajoice was already housed at SSCF's medical unit when Cameron arrived there in May 2015. (Doc. 72-2 at 14.) Commissioner Menard testified that she has no memory or knowledge of Lajoice. (Doc. 78-14.) Potanas was "familiar" with Lajoice for at least five years before the December 2015 altercation and recalled that he was "loud" and that he "didn't like to follow orders." (Doc. 72-10 at 4.) Potanas testified that he had no "specific recollections" of Lajoice engaging in any violent behavior before the December 2015 altercation. (*Id.*)

Rutherford knew Lajoice as a "minimum custody" "older gentleman" who "had done a lot of time over the years." (Doc. 78-13 at 7.) According to Rutherford, Lajoice was "[s]omewhat cantankerous" but was "largely compliant" and was recovering from a significant illness. (*Id.*) Rutherford testified that he never observed Lajoice act violently, but that he was aware of "some instances" of violence over the course of Lajoice's "pretty lengthy career" with DOC. (*Id.* at 9.) Rutherford testified that he could not recall "specifics" about the prior instances of violence, but that Lajoice's history was "not so much so that he acquired a reputation of—you know, perhaps of one of our more dangerous individuals or somebody where we were actively and regularly concerned about—about his risk to others." (*Id.*)

Plaintiff asserts—without citing evidence—that Defendants knew Lajoice was in prison "for beating women." (Doc. 81-1 at 13, ¶ 41.) It appears that prior criminal convictions of some type led to a felon-in-possession charge against Lajoice in 1991. *See United States v. George*, 975 F.2d 72, 75 (2d Cir. 1992). But Plaintiff has supplied no evidence regarding Lajoice's criminal history or regarding the extent to which any of the defendants were aware of that history.

At some point in mid-December 2015, Lajoice asked to be moved to the medical unit's upper floor for privacy reasons. (Doc. 72-2 at 14–15.) It is undisputed that Lajoice was moved to cell #25, adjacent to Cameron's cell #24 on the second floor of the unit. When asked who decided to place Cameron and Lajoice in adjacent cells, Potanas testified: "Cell assignments were generally handled by the unit caseworker, CSS, and sometimes with input from the L.U.S., living unit supervisor, who was the caseworker's direct supervisor." (Doc. 72-3 at 25.) Potanas further testified that such decisions did not require his approval as Superintendent. (*Id.*) Rutherford similarly testified that the unit officer and unit caseworker were "most likely" the people who decided to place Cameron and Lajoice in adjacent cells and that they had authority to do so as long as it was consistent with Cameron's housing plan. (Doc. 78-5 at 48.)

Cameron suggests that there is a dispute about who made the decision to place her and Lajoice in adjacent cells. She notes that Potanas and Rutherford were members of the MDT and cites the provision of Policy 432.01 that states: "All determinations regarding the housing of a transgender . . . inmate will be made by a management team consisting of the Director of Correctional Facilities; the Health Services Director; the Corrections Case Work Director; and a DOC employee with the ability and knowledge needed to represent LGBTQI interests." Policy 432.01 at 8. The court rejects Plaintiff's attempt to show a dispute on this issue. The cited policy language refers to the decisions of a "management team" comprised mainly of DOC central office personnel, not to the decisions of an MDT. Potanas's and Rutherford's membership on the MDT is not evidence that they had any involvement in the decision to place Cameron and Lajoice in adjacent cells.[9]

---

[9] Plaintiff objects to an alleged "inference" in the R&R that Defendants "had no involvement in the placement of inmate Lajoice next to Plaintiff." (Doc. 85 at 3, ¶ 3i.) The

14

**The Altercation on December 21, 2015**

According to a transcribed statement that Cameron gave to Vermont State Police (VSP) Detective Trooper Brian Berry on December 28, 2015, Cameron and Lajoice generally "got along" before the altercation. (Doc. 78-17 at 5.) Although Cameron "never asked [Lajoice] for anything," Lajoice would give Cameron "food and stuff like that." (*Id.*) Before the altercation, Cameron never filed a complaint or grievance about any interaction with Lajoice. (Doc. 72-2 at 16.)

But Cameron had "problems" with Lajoice on two specific occasions. (*Id.*) Although Cameron could not remember the precise date of the first interaction, she recalls that Lajoice made a sexual proposal in the medical unit day room. (*Id.* at 17.) She told him that she was not interested, and that was "the end of that conversation." (*Id.*) Cameron testified that after she declined Lajoice's proposal, he was "rude," "short," and "not pleasant" with her. (*Id.* at 23–24.) She avoided any "intentional[]" interactions with Lajoice in the weeks between this first interaction and the altercation at issue. (*Id.* at 18.)

The second problematic interaction occurred earlier in the day of the altercation when Cameron was on her way from the medical building to the "ABC" building. (*Id.* at 18.) Cameron was in the vestibule of the ABC building and she saw Lajoice on his way out of the building. (*Id.* at 19.) The vestibule was small; it could "only accommodate one person either walking out or walking in." (*Id.* at 20.) Lajoice "pushed the door open in such a way that if [Cameron] didn't move, then [she] would have been struck with the door." (*Id.* at 19.) After avoiding being struck with the door, Cameron turned around and called Lajoice an "asshole."

---

court concludes that no evidence or inference supports a conclusion that any defendant was involved in the decision to place Cameron and Lajoice in adjacent cells.

(*Id.* at 21; *see also* Doc. 78-17 at 4.)  According to Cameron's statement to Detective Berry, Lajoice responded: "[W]e live right next to each other so we'll deal with it later."  (Doc. 78-17 at 4.)

An officer heard at least part of that interaction and instructed Cameron to "lock in" to her cell for two hours and further instructed Lajoice to remain "lock[ed] out" of his cell for two hours.  (Doc. 72-2 at 21.)  Cameron walked back to the medical unit and spent two hours in her cell.  (*Id.*)  Lajoice spent two hours outside of his cell.  (*Id.* at 21–22.)  Neither spoke to the other during this two-hour period.  (*Id.* at 22.)

After the two-hour "lock in," Cameron wanted to "confront" Lajoice about being rude to her.  (*Id.*)[10]  She walked out of her cell and directly to Lajoice's adjacent cell.  (Doc. 72-2 at 22.)  The door to Lajoice's cell was open and Lajoice was standing in the doorway or by the end of his bunk closest to the door.  (*Id.*; *see also* Doc. 78-17 at 7.)  Cameron stood with her toes about six inches from the threshold.  (Doc. 72-2 at 32.)  She testified that she "was going to ask [Lajoice] what his problem was" but that she "didn't get to really say anything."  (*Id.* at 22.)  At most, Cameron uttered a few words; she stated that she "was in the middle of a sentence"[11] when Lajoice raised his hands and told her to "put your fucking hands up and come fight me."  (Doc. 78-17 at 6.)  She responded: "I'm not that stupid, I'm not going to walk in your cell."  (*Id.*)

Lajoice then started hitting Cameron in the face.  (*Id.* at 7; *see also id.* at 12 (asserting that Lajoice "threw the first physical punches").)  He grabbed Cameron's hair and pulled her into

---

[10] According to her statement to Detective Berry, Cameron "already had it in my mind to confront him [Lajoice] when they let me out."  (Doc. 78-17 at 4–5.)  By "confront," she meant she wanted to ask Lajoice "why he was being . . . an asshole."  (*Id.* at 5.)

[11] The R&R finds that "no reasonable jury would believe that Cameron said *nothing* when she stood outside Lajoice's cell before the assault occurred" and concludes that Cameron "instigated" the fight.  (Doc. 84 at 42.)

his cell. (Doc. 72-2 at 22.) At the same time, apparently, Cameron "charged" or tried to push Lajoice back into his cell in an effort "to make him stop"; they ended up in Lajoice's cell "[b]oth" because she pushed him and because he pulled her. (*Id.* at 26.) Cameron scratched Lajoice with her fingernails. (*Id.* at 27.) She sustained more severe injuries in the altercation. (*See id.*; *see also* Doc. 78-17 at 11 (testimony that Lajoice hit Cameron "like 20 times"); *id.* at 13 (discussing injuries to Cameron's eye, nose, and neck); Doc. 79-12 (photos).) Officers responding to the altercation found Cameron at the rear of Lajoice's cell bleeding from the face and head. (Doc. 78-18 at 2.)

**Aftermath**

Multiple SSCF officers submitted narratives as part of an Incident Report regarding the altercation. Officer Jenkins's narrative includes the following statement summarizing Cameron's responses to his inquiries while Cameron was in the main medical unit before she was transported to the hospital:

> She informed me that it started when she confronted inmate LaJoice about an earlier incident when he shut a door on her and it almost hit her. She got locked in for this and he got locked out. After her lock in was completed she confronted him in his cell to inform him that it it happened again they may fight. At that time inmate LaJoice assaulted her.

(Doc. 78-18 at 3.)

As a result of the altercation, Cameron received a disciplinary report (DR) charge of "Major A-5 Fighting where bodily injury is attempted or carried out." (Doc. 72-19.) On December 29, 2015, Cameron signed a DOC "Discipline Waiver of Appearance/Hearing/Refusal to Appear" form, indicating that she did not wish to appear at the scheduled disciplinary hearing

and that she would accept 14 days of segregation as discipline for the charge, modified to a "Major B" violation. (Doc. 72-16.)[12]

By letter dated December 23, 2015—two days after the altercation—DOC Director of Classification Cullen Bullard stated to Cameron:

> I am in receipt of the letter you sent to Commissioner Menard, requesting to be moved to another facility due to the emotional difficulties you have been having. The Commissioner has asked me to respond to your letter.
>
> You have been assessed to be housed appropriately. If you would like this matter reviewed, please follow the grievance process.

(Doc. 72-17.) Commissioner Menard testified that she does not recall reading either of Cameron's December 2015 letters and that she does not recall advising Bullard to respond to the letters. (*See* Doc. 84 at 32–33 and evidence cited.) More generally, Menard testified that she does not recall being aware of Cameron before this litigation started. (Doc. 78-4 at 32.) She also does not recall playing any role in the decision of where Cameron would be placed in Vermont's correctional system. (*Id.* at 52.)

### **Standard of Review**

Where a magistrate judge enters a recommended disposition on a dispositive motion, a district judge must determine "de novo" any part of the recommendation to which a party properly objects. Fed. R. Civ. P. 72(b)(3); *see also* 28 U.S.C. § 636(b)(1); *Cullen v. United States*, 194 F.3d 401, 405 (2d Cir. 1999). Rule 72 requires that objections to an R&R must be "specific." Fed. R. Civ. P. 72(b)(2). Where a party "makes only conclusory or general arguments, or simply reiterates the original arguments, the Court will review the Report strictly for clear error." *Sacks v. Gandhi Eng'g, Inc.*, 999 F. Supp. 2d 629, 632 (S.D.N.Y. 2014)

---

[12] DOC Directive 410.01 defines the relevant "Major B" violation as "fighting where serious bodily injury was not carried out." (Doc. 78-21 at 20.)

(quoting *IndyMac Bank, F.S.B. v. Nat'l Settlement Agency, Inc.*, No. 07 Civ. 6865, 2008 WL 4810043, at *1 (S.D.N.Y. Nov. 3, 2008)).

"The court may adopt those portions of the [R&R] to which no objection is made as long as no clear error is apparent from the face of the record." *United States v. Shores*, No. 17-cr-00083, 2024 WL 489313, at *10 (D. Vt. Feb. 8, 2024) (alteration in original; quoting *Green v. Dep't of Educ. of City of N.Y.*, No. 18 Civ. 10817, 2020 WL 5814187, at *2 (S.D.N.Y. Sept. 30, 2020)). The district judge may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1); *see also Cullen*, 194 F.3d at 405.

Defendants argue for "clear error" review of all issues because, in their view, all of Plaintiff's objections are mere reiterations of arguments that Plaintiff advanced in her original moving papers. (Doc. 86 at 3; Doc. 87 at 2.) The court concludes that it is unnecessary to attempt to determine whether each of Plaintiff's objections simply restates prior arguments. The court would reach the conclusions below under either a "de novo" or a "clear error" review.

<u>**Analysis**</u>

As noted above, Plaintiff's Objections to the R&R include 11 instances (numbered 3a through 3k) where, according to Plaintiff, the R&R improperly draws inferences in favor of Defendants. (*See* Doc. 85 at 1–3.) The court reviews each of these 11 items below, organized as relevant to the grounds for granting summary judgment as articulated in the R&R. But first, the court briefly reviews the applicable law.

As noted in the R&R, the remaining cause of action in this case is a claim under 42 U.S.C. § 1983 that Defendants failed to protect Cameron in violation of the Eighth Amendment.

> [A]n inmate seeking to establish an Eighth Amendment violation for failure to protect or deliberate indifference to safety must prove (1) "that [the plaintiff] is incarcerated under conditions posing a substantial risk of serious harm," and (2) that the prison official had a "sufficiently culpable state of mind," which in "prison-conditions cases" is "one of deliberate indifference to inmate health or safety."

*Morgan v. Dzurenda*, 956 F.3d 84, 89 (2d Cir. 2020) (second alteration in original) (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). Such claims are "fundamentally backward-looking, pertaining to the conditions of . . . confinement and Defendants' awareness and behavior" up until the time of the assault. *Clark v. Hanley*, 89 F.4th 78, 101 (2d Cir. 2023) (citing *Morgan*).

The R&R observes that "Defendants . . . appear to concede that as a transgender female with identifiable female features, Cameron . . . was incarcerated under conditions posing a substantial risk of [serious] harm." (Doc. 84 at 16 (citing cases).) The court concurs, and Defendants do not challenge that conclusion in their filings. (*See* Docs. 86, 87.) Indeed, Potanas specifically conceded that, at the time he was SSCF Superintendent in 2015, he was concerned "that transgender female inmates were at greater risk of physical and sexual assault in a male facility as compared to the general population." (Doc. 72-3 at 8.)

However, as the R&R also points out, "it is not enough for prison officials to have knowledge of a substantial risk to a plaintiff; they must also consciously disregard that risk." (Doc. 84 at 17.) The *Morgan* court explained:

> [A] prison official does not act in a deliberately indifferent manner unless that official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

*Morgan*, 956 F.3d at 89 (alteration in original) (quoting *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994)). "In the context of a convicted prisoner asserting a violation of an Eighth Amendment right to be free from cruel and unusual punishments, the Supreme Court

in *Farmer* defined deliberate indifference subjectively, meaning that a prison official must appreciate the risk to which a prisoner was subjected." *Darnell v. Pineiro*, 849 F.3d 17, 35 (2d Cir. 2017).[13]

This inquiry into the official's mental state is "a stringent standard of fault" that "necessarily depends on a careful assessment of the facts at issue in a particular case." *Cash v. County of Erie*, 654 F.3d 324, 334 (2d Cir. 2011) (internal quotation marks omitted); *see also Paul v. City of New York*, No. 16-CV-1952, 2017 WL 4271648, at *6 (S.D.N.Y. Sept. 25, 2017) ("Deliberate indifference is a fact-intensive inquiry."). As noted in the R&R, "courts consider the particular circumstances of the situation to discern whether officials had reason to know of particular risks to the inmate." (Doc. 84 at 27.) The court has endeavored to recite the relevant facts above and proceeds here to discuss the facts in the context of Plaintiff's arguments regarding the inferences that should be drawn from those facts. The court is mindful that "courts are generally reluctant to dispose of a case on summary judgment when mental state is at issue" but that "it is permissible to do so where there are sufficient undisputed material facts on the record." *Lipton v. Nature Co.*, 71 F.3d 464, 472 (2d Cir. 1995).

## I.   Personal Involvement

"[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." (Doc. 84 at 29 (quoting *Spavone v. N.Y.*

---

[13] As discussed in *Darnell*, the "mens rea" requirement is different when analyzing claims brought by pretrial detainees under the Due Process Clause of the Fourteenth Amendment. *See id.* ("After *Kingsley* [*v. Hendrickson*, 576 U.S. 389 (2015)], it is plain that punishment has no place in defining the *mens rea* element of a pretrial detainee's claim under the Due Process Clause. Unlike a violation of the Cruel and Unusual Punishments Clause, an official can violate the Due Process Clause of the Fourteenth Amendment without meting out any punishment, which means that the Due Process Clause can be violated when an official does not have subjective awareness that the official's acts (or omissions) have subjected the pretrial detainee to a substantial risk of harm.").

*State Dep't of Corr. Servs.*, 719 F.3d 127, 135 (2d Cir. 2013).)  In order to prevail on her claim, Plaintiff must show that each defendant "knew of and disregarded an excessive risk to her health or safety." (*Id.* at 30 (cleaned up).)

Plaintiff asserts that the R&R improperly infers "that there was a lack of personal involvement from Defendants Potanas, Rutherford and Menard." (Doc. 85 at 2, ¶ 3d.)  Potanas maintains that the R&R properly concludes "that there was no evidence that Potanas participated directly in any constitutional violation, not as Plaintiff suggests, that he was wholly uninvolved in Cameron's incarceration at the facility." (Doc. 86 at 4.)  The remaining defendants contend that "[t]he evidence cited by Plaintiff does not reflect Defendants' knowledge of a serious risk of physical harm" and that the R&R reaches conclusions on this issue that are "consistent with controlling Second Circuit law." (Doc. 87 at 4.)

Plaintiff further contends that the R&R incorrectly finds that Defendants "had no involvement in the placement of Plaintiff at SSCF and had no involvement in the placement of inmate Lajoice next to Plaintiff." (Doc. 85 at 3, ¶ 3i.)  Potanas asserts that Plaintiff has provided no evidence contrary to his testimony on this point. (Doc. 86 at 5.)  The remaining defendants maintain that Plaintiff's objection on this point "is not based on an inference" and that the R&R "considered Defendants' uncontroverted evidence and credited it." (Doc. 87 at 5.)

The R&R concludes that "there are no triable issues of material fact as to whether any of the Defendants were personally involved in an Eighth Amendment violation." (Doc. 84 at 33.)  The court reviews that conclusion here, with reference to the "Examples of Personal Involvement" outlined in Plaintiff's Objections (Doc. 85 at 6–8, ¶¶ 16–25).

A.    **Commissioner Menard**

The R&R finds no triable issue as to Menard's personal involvement because Menard did not recall reading either of Plaintiff's December 2015 letters or advising Bullard to reply, and because "[e]ven if Menard had read Cameron's December 2015 letters and then advised [Bullard] to send his response, Cameron's complaints of ridicule, disrespectful treatment, and emotional difficulties at SSCF are insufficient to put Menard or any other Defendant on notice of a substantial risk of harm." (Doc. 84 at 32–33.) Plaintiff asserts that personal involvement is established because Plaintiff's two December 2015 letters "alerted [Menard] to a serious risk of physical harm." (Doc. 85 at 7, ¶ 23.)

On a motion to dismiss, a plaintiff may be entitled to an inference that an official received the plaintiff's letter, "read it, and thereby became aware of the alleged conditions." *Grullon v. City of New Haven*, 720 F.3d 133, 141 (2d Cir. 2013).[14] And, in that context, questions about whether the official's response to the letter was appropriate would likely be "factual issues" inappropriate for resolution "without development of a factual record." *Id.* But Plaintiff's case has progressed well beyond the motion-to-dismiss stage. Plaintiff's case is more like *Sealey v. Giltner*, 116 F.3d 47 (2d Cir. 1997), as discussed in *Grullon*. The *Sealey* court held that "the record warranted summary judgment in favor of the supervisor because it showed that he had in fact taken steps to have the prisoner's grievance resolved." *Grullon*, 720 F.3d at 141

---

[14] *Grullon* was decided under the rubric of the five-part inquiry for a supervisory official's liability as stated in *Colon v. Coughlin*, 58 F.3d 865 (2d Cir. 1995). The Second Circuit held in *Tangreti v. Bachmann*, 983 F.3d 609 (2d Cir. 2020), that the "special standards for supervisory liability set forth in *Colon*" could not stand after the Supreme Court's decision in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). *See Tangreti*, 983 F.3d at 618 ("[A]fter *Iqbal*, there is no special rule for supervisory liability."). But *Tangreti* did not overrule *Grullon*, and the court finds *Grullon* instructive here.

(discussing *Sealey*).  Namely, the supervisor in *Sealey* referred the plaintiff's letter to a

subordinate for a response.  *Sealey*, 116 F.3d at 51.

The same is true here.  The fact that Bullard responded to Cameron's letters indicates

that, either by direct order to a subordinate or by central office procedure, Menard took steps to

resolve the issues in the letters, and those steps were appropriate based on the content of the

letters.[15]  Although Bullard's letter to Cameron is dated two days after the December 21

altercation, the court agrees with the R&R that there is no triable issue of material fact as to

whether Menard was personally involved in any constitutional violation.

The court rejects Plaintiff's contention that this conclusion rests on an inference that

Cameron never put Menard "on notice of fear of a physical assault."  (Doc. 85 at 1, ¶ 3a.)  As

noted in the R&R, the issues that Cameron raised in her letters to the Commissioner related to

ridicule, disrespectful treatment, and emotional difficulties.  (Doc. 84 at 33.)  No inference is

necessary to conclude that these complaints did not put the Commissioner on notice that

Cameron feared any physical assault.

Emphatically, this is not to say that such disrespectful treatment of a transgender prisoner

should be tolerated or that it could never lead to assault.  Policy 432.01 recognizes that tolerating

disrespect, harassment, or abuse negatively impacts inmate safety.  Policy 432.01 at 2, ¶ *i*.  Other

authorities are in accord.  *See Beal v. Foster*, 803 F.3d 356, 358–59 (7th Cir. 2015) (Posner, J.)

(reasoning that a prison guard's verbal harassment labeled the plaintiff as a homosexual, possibly

inspired or encouraged inmates to do the same, and "[c]onceivably" caused the plaintiff to fear

that such comments "increased the likelihood of sexual assaults on him by other inmates");

---

[15] Bullard might have acted unilaterally and without authorization, but the court cannot
conclude that it can reasonably infer that circumstance.  Nor would that be sufficient to establish
Menard's personal involvement.

Susan J. Stabile, *Othering and the Law*, 12 U. St. Thomas L.J. 381, 386 (2016) (noting that "othering" can "lead to the commission of horrendous acts against those who[m] we label as others").

But Cameron's letters to Menard did not actually raise a concern that the disrespectful treatment posed any particular safety concern for her. Nor can the court conclude that Menard could have inferred a safety concern from Cameron's letters in excess of the pre-existing general concern for the safety of transgender females housed in a male facility. And the Commissioner's response did not condone the conduct alleged in the letters. Instead, the response focused on the narrow issue of housing, stating that Cameron was "assessed to be housed appropriately." (Doc. 72-17.) The Commissioner's response also advised that the grievance process was available for review of the matter. (*Id.*) The court therefore adopts the R&R's conclusion that "Cameron's complaints of ridicule, disrespectful treatment, and emotional difficulties at SSCF are insufficient to put Menard . . . on notice of a substantial risk of harm to Cameron." (Doc. 84 at 33.) And while "failure to give advance notice is not dispositive" in a failure-to-protect case, *Farmer*, 511 U.S. at 848, Plaintiff has produced no other evidence that could establish Menard's personal involvement.

### B.   Superintendent Potanas

There appear to be two components to Plaintiff's theory as to Potanas's alleged personal involvement. She asserts that Potanas was involved in her "placement" at SSCF and in placing Lajoice in the cell next to hers. (Doc. 85 at 3, ¶ 3i.) She also asserts that she and others made Potanas aware of her complaints, but Potanas failed to take appropriate action. (*See id.* at 6.) The court considers these assertions in turn.

### 1.    Housing Decisions

As noted above, none of the defendants were involved in DOC's decision to place Cameron at SSCF. Potanas was part of the MDT that decided to house Cameron in SSCF's medical unit, but—at least initially—Cameron did not object to being housed in the medical unit. Instead, she argues that this safety measure was insufficient to protect her from serious harm, particularly after she started "voicing all of her complaints." (Doc. 85 at 2, ¶ 3c.) The court reviews Potanas's response to Cameron's complaints below.

As for the cell assignments within the medical unit—including Lajoice's move to the cell adjacent to Cameron's—the undisputed evidence is that Potanas was not involved. According to his affidavit:

> Cell assignments at SSCF did not require approval of the Superintendent, and the Superintendent would only make cell assignment decisions if a caseworker made a specific cell assignment request to the Living Unit Supervisor ("LUS"), the LUS then transferred that request to the Chief of Security, and then the Chief of Security transferred that request to the Superintendent. No such request was made of me for Cameron's cell assignment at any time while she was housed at SSCF.

(Doc. 72-6 ¶ 6.) Plaintiff has not produced any contrary evidence on this point.

### 2.    Response to Complaints

Potanas testified that he was a "hands-on superintendent," meaning that he was present at SSCF in person and interacted with inmates and staff on a regular basis. (Doc. 72-3 at 6–7.) He testified that he knew who Cameron was and recalled observing her interact with staff at various locations within the facility. (*Id.* at 12.) Apart from the September 2015 email from Michael Groner, Potanas testified that he did not recall any staff alerting him to other instances where Cameron was mistreated. (*Id.* at 13.) He also testified that he did not recall any particular conversation with Cameron except for one instance when she stated that she wanted to go to a 50-man unit with younger inmates. (*Id.* at 20.) Potanas stated in his affidavit that, before the

altercation, "Cameron did not notify me or anyone else at SSCF that she was the victim of a physical assault, an attempted physical assault or a threatened physical assault." (Doc. 72-6 ¶ 9.)

Regarding the September 2015 email from Groner, Plaintiff's complaints were similar to the concerns she expressed in her letters to Menard. According to Plaintiff's deposition testimony, she also raised similar concerns at an in-person meeting with Potanas at some point before December 21, 2015. (Doc. 72-2 at 29.) For the reasons discussed above, the court agrees with the R&R that "Cameron's complaints of ridicule, disrespectful treatment, and emotional difficulties at SSCF are insufficient to put. . . any . . . Defendant on notice of a substantial risk of harm to Cameron." (Doc. 84 at 33.)

Moreover, the evidence indicates that Potanas instructed his subordinates to start an investigation "ASAP." (Doc. 79-10 at 6.) Thus, as the R&R correctly finds (Doc. 84 at 32), Potanas's response to the issues raised in September 2015 was to instruct his subordinates to start an investigation. That instruction was appropriate for Potanas's level of authority as SSCF Superintendent. The court adopts the R&R's conclusion that there is no triable issue of material fact as to whether Potanas was personally involved in an Eighth Amendment violation. (Doc. 84 at 33.)

## C.    Security and Operations Supervisor Rutherford

For reasons similar to those discussed above with respect to Potanas, the court also adopts the R&R's conclusion that there is no triable issue as to whether Rutherford was personally involved in a constitutional violation. Rutherford was not involved in DOC's decision to place Cameron at SSCF. Like Potanas, Rutherford was part of the MDT that decided to house Cameron in SSCF's medical unit, but—at least initially—Cameron did not object to

being housed in the medical unit. And there is no evidence that Rutherford was involved in any relevant cell assignments within the medical unit.

It is true that Rutherford was on the email chain from Groner, and Rutherford was one of the two officials that Potanas ordered to investigate Cameron's complaints "ASAP." It is also true that no documentation indicates that any investigation took place or whether Rutherford carried out the investigation. However, even if the court infers that Rutherford failed to carry out Potanas's order to investigate, that would not prove personal involvement in a failure to respond appropriately to a concern about physical violence against Cameron. As discussed above, Cameron's complaints were about ridicule, disrespectful treatment, and emotional difficulties. Those are important concerns, but not sufficient to prove Rutherford's personal involvement in failing to protect Cameron from a physical attack.

In her affidavit, Cameron states that she spoke directly with Rutherford about not feeling safe and requested a transfer to an all-women's facility, to which Rutherford replied: "That's not going to happen." (Doc. 81-5 ¶ 6.) The R&R concludes that Plaintiff's testimony on these points is insufficient to defeat Defendants' Rule 56 motions because the testimony is uncorroborated, "conclusory and unspecific," and outweighed by "other evidence indicating that Cameron's concerns at SSCF were related to verbal abuse and her placement in the Medical Unit instead of in general population." (Doc. 84 at 23 n.5.) The court adopts these conclusions. Even crediting Cameron's testimony, a general remark that she did not feel safe and wanted to be moved lacks "any details that would give a reasonable officer a non-speculative basis to perceive a serious risk to an inmate's safety." *House v. City of New York*, No. 18 Civ. 6693, 2020 WL 6891830, at *16 (S.D.N.Y. Nov. 24, 2020). The court adopts the R&R's conclusion that there is

no triable issue of material fact as to whether Rutherford was personally involved in an Eighth Amendment violation. (Doc. 84 at 33.)

## II.     Mental State; Deliberate Indifference

Although the lack of personal involvement is sufficient to grant summary judgment to Defendants, the R&R also analyzes the evidence regarding Defendants' mental state, concluding that "there are no genuine disputes of material fact as to whether any Defendant was deliberately indifferent to the risk of harm posed to Cameron by Lajoice or any other inmate." (Doc. 84 at 29.) The court concurs and adopts that conclusion for the reasons that follow.

### A.     Notice of Fear of Physical Assault

Plaintiff's first objection is that the R&R improperly infers that she "never put the Defendants on notice of fear of a physical assault." (Doc. 85 at 1, ¶ 3a.) The R&R includes significant discussion of Cameron's communications to DOC personnel regarding her conditions of confinement, including the report documented in the email of September 6 regarding inappropriate comments, Cameron's grievances of September 12 and 15, and her two letters to Commissioner Menard in December. As discussed above, the court agrees with the R&R that none of those communications were directly about any perceived risk of physical assault. (*See* Doc. 84 at 32 ("Although there is evidence that Cameron complained to Menard, Rutherford, and Potanas about her living situation at SSCF, her complaints were about emotional difficulties and verbal harassment, not assault.").)

The court is mindful that consideration of any notice that Cameron gave indicating that she feared for her safety is relevant but not dispositive to the deliberate-indifference inquiry. *See Farmer*, 511 U.S. at 848 ("[T]he failure to give advance notice is not dispositive."). The court proceeds to consider the other circumstances in this case, as raised in Plaintiff's

enumerated objections, that may have put Defendants on notice that Cameron faced a risk of serious harm.

### B.    First and Only Transgender Woman at SSCF

Plaintiff contends that the R&R improperly infers that her status "as the first and only transgender woman at SSCF, in and of itself, was not sufficient to constitute a known risk of serious harm that the Defendants could have consciously disregarded."  (Doc. 85 at 2, ¶ 3b.) Defendants argue that this is a rehashed legal argument unsupported by legal authority and contrary to the extensive authorities cited in the R&R.  (Doc. 86 at 4; Doc. 87 at 4.)

The R&R does not specifically describe Plaintiff as the first and only transgender woman at SSCF.  But the R&R does acknowledge Defendants' concession that, as a transgender female, "Cameron was incarcerated under conditions posing a substantial risk of harm."  (Doc. 84 at 16.) The more difficult question concerns Defendants' mental state: did they consciously disregard any substantial risk of serious harm?  (*See id.* at 17.)  As discussed above, making that determination requires a careful assessment of all the relevant facts.

The R&R discusses the significance of prior altercations with or threats by the assailant, as well as any knowledge by Defendants of a history of prior similar inmate-on-inmate attacks. (Doc. 84 at 18–20.)  There is no evidence that Defendants were aware of any prior altercations between Lajoice and Cameron or any threats Lajoice might have made against Cameron.[16] Plaintiff's status as the first transgender inmate at SSCF arguably means that Defendants

---

[16] The court can infer that the officer who heard Cameron and Lajoice's interaction at the ABC building also heard Lajoice tell Cameron that "we'll deal with it later."  The court can also infer that Lajoice's statement could be interpreted as a threat.  There is no evidence that the officer who overheard the interaction reported the incident or that Menard, Potanas, or Rutherford were aware of the incident at the ABC building before the altercation in the medical unit.

arguably could not have been aware of any history of prior "similar" attacks. (*Id.* at 20 (quoting *Parris v. N.Y. State Dep't of Corr. Servs.*, 947 F. Supp. 2d 354, 363 (S.D.N.Y. 2013).)

Still, as noted in *Manning v. Griffin*, "whether or not there were any prior assaults on transgender inmates is really not the bar that plaintiff has to meet in order to establish" the mental-state prong. *Manning v. Griffin*, No. 15 Cv. 00003 (S.D.N.Y. June 21, 2017), ECF 78. Thus, as in *Manning*, the court must consider Defendants' knowledge of the heightened risk to Plaintiff's safety as a transgender inmate in a male facility together with their knowledge of the safety measures in place and what additional measures could have been implemented. *See id.* The court is reviewing all the circumstances here to make that assessment.

C.    **Sufficiency of Placement in the Medical Unit as a Safety Measure**

Plaintiff further contends that the R&R improperly infers that the decision to house her in the medical unit was sufficient to protect her from serious harm. (Doc. 85 at 2, ¶ 3c.)[17] Potanas asserts that Plaintiff "provides no factual evidence to support the bald assertion that such placement was in fact insufficient, and further ignores caselaw supporting Defendant's contention and the Magistrate's analysis, that such measures support a finding that there was no constitutional deficiency in Plaintiff's housing assignment." (Doc. 86 at 4.)

As noted in the R&R, Potanas and Rutherford were both part of the MDT that decided to house Cameron in SSCF's medical unit. (Doc. 84 at 31.) The MDT made that decision, in part, out of a concern for her safety due to her transgender identification. (*Id.* at 3.) The R&R further concludes that "Cameron has not submitted any evidence indicating that the placement decision

---

[17] Plaintiff describes the housing decision as Potanas's decision. (*Id.*) Defendants Menard and Rutherford therefore conclude that Plaintiff's objection on this point "appears to relate solely to Defendant Potanas." (Doc. 87 ¶ 3c.) But the evidence indicates that the MDT—including both Potanas and Rutherford—made the decision to place Cameron in the medical unit.

was constitutionally deficient." (*Id.* at 31.) The court agrees with that conclusion; indeed, Cameron understood that she was placed in the medical unit for her safety and—at least initially—did not object to that placement.[18]

The court also rejects Plaintiff's suggestion that the R&R inferred—or otherwise concluded—that housing Cameron in the SSCF's medical unit was "sufficient" to protect her from harm. The R&R recognizes that placing Cameron in the medical unit was an appropriate (maybe even necessary) safety precaution. (*See id.* (citing *Aliahmed v. Troxler*, 839 F. App'x 675, 677 (3d Cir. 2021) (per curiam).) But the court does not read the R&R as concluding that housing Cameron in the medical unit was *sufficient* to protect her. On this point, the court finds no fault in the R&R's analysis.

### D.    Potential Transfer to CRCF

Plaintiff faults the R&R for inferring that transferring her to Vermont's women's facility, CRCF, "never needed to be considered, pondered or discussed, at any point, by any Defendant, prior to Plaintiff's arrival [at SSCF] or at any point following Plaintiff's complaints." (Doc. 85 at 2 ¶ 3e.) Defendants Menard and Rutherford assert that the R&R contains no such inference or conclusion. (Doc. 87 at 4–5.) Defendant Potanas maintains that "[t]he issue is not whether Cameron's incarceration at SSCF was ever discussed by Defendants (which it was) but rather

---

[18] Cameron's initial placement in the medical unit was not constitutionally deficient. However, that placement might have violated Policy 432.01 and 28 C.F.R. § 115.42(g) if she was housed there *solely* based on her transgender status. The absence of any documentation regarding the MDT's process makes it difficult to determine what—if any—basis the MDT had for housing Cameron in the medical unit apart from her transgender status. Although Defendants challenge the series of assertions in Plaintiff's Objections regarding alleged "Emotional Torture of Isolation in Medical Unit" (Doc. 85 ¶¶ 26–32) as relevant only to unasserted emotional-harm claims, Cameron's placement in the medical unit is potentially relevant insofar as it is evidence as a policy violation. *See infra.*

whether the placement itself, over which Defendant Potanas had no control, was by itself a constitutional violation." (Doc. 86 at 4.)

The court agrees that the R&R does not expressly infer or conclude that none of the defendants ever needed to consider or discuss transferring Cameron to CRCF. The R&R *does* conclude that "transgender female inmates do not have a constitutional right to placement in an all-women's prison." (Doc. 84 at 28.) Plaintiff cites no authority to the contrary on that point.

### E.    Investigation in Response to Complaints Documented by Groner

Next, Plaintiff contends that the R&R erroneously infers "[t]hat an investigation into Plaintiff's complaint of sexual harassment was conducted by Defendant Rutherford." (Doc. 85 at 2, ¶ 3f.) Rutherford disagrees, stating that "[t]he RR did not conclude the investigation did or did not occur." (Doc. 87 at 5.)

The court agrees that the R&R makes no express determination as to whether any DOC official carried out an investigation on Potanas's order to do so "ASAP." But, as discussed above, even if the court infers that Rutherford failed to carry out Potanas's order to investigate, that would not prove deliberate indifference. Cameron's complaints were about ridicule, disrespectful treatment, and emotional difficulties. Those are important concerns, but not sufficient to prove Rutherford was deliberately indifferent to a risk of a physical attack.

### F.    Lajoice's History

Plaintiff argues that the R&R improperly infers that Defendants did not know Lajoice as "a dangerous inmate to house directly beside Plaintiff." (Doc. 85 at 3, ¶ 3h.) Defendants Menard and Rutherford disagree, stating: "The RR's conclusion that Mr. Lajoice was not known by the Defendants to be a dangerous inmate to house directly beside Plaintiff is the product of uncontroverted evidence to that effect, not an inference." (Doc. 87 at 5.) They further assert that

"Plaintiff also simply did not respond to a relevant factual assertion in the parties' summary judgment briefing." (*Id.* at 5 n.4.)[19]

The R&R concludes that "there is no evidence that any of the Defendants had reason to believe Lajoice presented a threat to Cameron's physical safety" (Doc. 84 at 21) and that no evidence establishes "that any Defendant was aware that Lajoice had a history as a violent or dangerous inmate, or that Lajoice harbored ill will toward Cameron specifically or transgender people in general" (*id.* at 24–25). The R&R recognizes Rutherford's testimony about "some instances" of violence in Lajoice's long history with DOC. (Doc. 84 at 25.) But Rutherford did not know specifics because "Lajoice's career in Corrections preceded my own by several decades"; Rutherford was "more familiar with sort of where he was at that time, which as I said, was an older, rather ill man." (Doc. 78-13 at 10.) Rutherford also testified that—consistent with Lajoice's "minimum custody" classification—Lajoice's history was "not so much that he acquired a reputation of—you know, perhaps of one of our more dangerous individuals or somebody where we were actively and regularly concerned about—about his risk to others." (*Id.* at 9.) The court agrees with the R&R that, in light of this unchallenged evidence, none of the defendants had a reason to believe that Lajoice posed a serious risk of physical harm to Cameron.

As noted above, Plaintiff also represents that Lajoice was incarcerated "for a felonious history of beating women." (Doc. 81-1 at 13.) Plaintiff cites no evidence supporting that representation, nor can the court verify that assertion based on the evidence in the record or publicly available information. And Plaintiff has supplied no evidence regarding whether any of the defendants were aware of that alleged history.

---

[19] Potanas's opposition does not discuss Objection ¶ 3h. (*See* Doc. 86 at 5.)

G.    **Violations of DOC and PREA Policy**

Finally, Plaintiff asserts that the R&R improperly infers "[t]hat the Defendants' violating

numerous VTDOC and PREA policies was not evidence of the Defendants consciously

disregarding a risk of serious harm to Plaintiff." (Doc. 85 at 3, ¶ 3k.) Defendants disagree,

arguing that "evidence of violation of a policy does not constitute a constitutional violation

giving rise to a § 1983 claim on the facts of this case." (Doc. 86 at 5; Doc. 87 at 6.) Defendants

Potanas and Menard further argue that Plaintiff failed to show "how any Defendant failed to

properly enforce or administer the policies in relation to the claim at issue in this case." (Doc. 87

at 6 (quoting R&R at 46).)

The R&R concludes that no evidence supports Plaintiff's argument that "Defendants'

alleged failure to follow and enforce the Prison Rape Elimination Act (PREA), 42 U.S.C.

§ 15601 *et seq.*, and DOC policies, establishes Defendants' deliberate indifference to a

substantial risk of harm to Cameron." (Doc. 84 at 43.) And according to the R&R:

"[N]otwithstanding Cameron's reference to specific DOC and PREA policies, she has not shown

how any Defendant failed to properly enforce or administer the policies in relation to the claim at

issue in this case." (*Id.* at 46.)

The R&R correctly notes that prison policies are "not designed to confer rights on

inmates," (Doc. 84 at 46 (quoting *Sandin v. Conner*, 515 U.S. 472, 482 (1995))), and that "PREA

confers no private right of action" (*id.* at 47). But Plaintiff is not seeking to bring a separate

cause of action for a PREA or any prison policy violation. Instead, she argues that violations of

DOC policy and PREA are evidence of Defendants' mental state and are therefore relevant to her

Eighth Amendment claim under § 1983.

As other courts in this circuit have recognized, "[a] violation of prison policy does not, alone, give rise to a claim under § 1983." *Pusateri v. City of Dunkirk*, No. 20-cv-00427, 2021 WL 3160768, at *8 (W.D.N.Y. July 27, 2021) (Reiss, J.). But it does not follow that violation of policy can *never* support a deliberate-indifference claim. Many policies—including PREA and Policy 432.01—are in place at least in part for the safety of incarcerated people. *See* Policy 432.01 at 1 (one purpose of the policy is to ensure compliance with PREA and other standards designed to provide "for the specific safety, security and medical needs of the LGBTQI inmates"). Violations of such policies could shed light on prison officials' mental state.

The R&R does not expressly find that any particular DOC or PREA policy was violated, but it does note that Plaintiff has referred to multiple "specific DOC and PREA policies." (Doc. 84 at 46.) The potentially relevant policies are cited above, including Policy 432.01 and the federal regulations implementing the PREA. The court agrees with the R&R, however, that "[t]here is no testimony that any policies were violated *to Cameron's detriment*." (Doc. 84 at 46 (emphasis added).)

Considering all of the topics discussed above and applying the "stringent" standard of fault for the requisite mental state on a failure-to-protect claim, the court adopts the R&R's conclusion that "there are no genuine disputes of material fact as to whether any Defendant was deliberately indifferent to the risk of harm posed to Cameron by Lajoice or any other inmate." (Doc. 84 at 29.)

### III. Causation; Effect of Cameron's Voluntary Conduct

As noted in the R&R, Defendants have advanced an alternative basis for summary judgment, arguing that "Cameron's own voluntary conduct in causing the altercation bars her

claim." (Doc. 84 at 36.) The Second Circuit has recognized that a § 1983 plaintiff has the

burden of proving both "but for" causation and "proximate" causation. *Arnold v. Geary*,

582 F. App'x 42, 43 (2d Cir. 2014) (summary order) (citing *Zahrey v. Coffey*, 221 F.3d 342, 352

n.8 (2d Cir. 2000), and *Townes v. City of New York*, 176 F.3d 138, 146 (2d Cir. 1999)). The

court considers the causation question here, mindful that "questions relating to proximate cause

are normally questions of fact." *Carmichael v. City of New York*, 34 F. Supp. 3d 252, 268

(E.D.N.Y. Aug. 1, 2014) (quoting *Adamczyk v. City of Buffalo*, No. 95-CV-1023E, 1998 WL

89342, at *5 n.11 (W.D.N.Y. Feb. 23, 1998)).

Plaintiff faults the R&R for inferring "[t]hat the blame for the fight . . . was Plaintiff's"

because, according to Cameron, "it was Lajoice who turned the encounter into a severe physical

beating." (Doc. 85 at 3, ¶ 3j.) Potanas argues that, on the "undisputed facts" of this case, "the

law considers Cameron to be the 'aggressor.'" (Doc. 86 at 5.) Potanas and Menard maintain that

the R&R does not infer that "blame for the fight" falls on any party, but instead properly

analyzes "the effect of Plaintiff's role" in the events leading to the altercation. (Doc. 87 at 6.)

The court does not read the R&R as stating that Cameron was the "aggressor" or that she

bore the sole blame for the fight. Rather, the R&R concludes that "Cameron's own actions were

the proximate cause of the altercation with Lajoice" and that she "instigated" the altercation.

(Doc. 84 at 39.) Thus, according to the R&R, "Cameron's own conduct bars her failure-to-

protect claim against Defendants." (*Id.* at 36.)

The R&R identifies numerous cases in which prisoners' own conduct barred their failure-

to-protect claims. (*See id.* at 36–38.) Plaintiff asserts that the cases cited are distinguishable.

(Doc. 85 at 10, ¶ 40.) The court agrees that the authorities support the proposition that a

plaintiff's own conduct can bar her failure-to-protect claim. *See, e.g., Miller v. Fisher*,

381 F. App'x 594, 595 (7th Cir. 2010) (plaintiff entered another inmate's cell and destroyed his property before chasing him to the dayroom); *Clark v. Johnson*, 181 F. App'x 606, 607 (7th Cir. 2006) (plaintiff threw a book at his cellmate); *Hailey v. Kaiser*, 201 F.3d 447 (Table), 1999 WL 1009614, at *1 (10th Cir. 1999) (while in the same yard as another inmate who stabbed him four years earlier, plaintiff could have avoided the altercation but instead attacked the other inmate); *Coleman v. Carson*, No. 19-CV-102, 2021 WL 3167739, at *4 (N.D. Ind. July 27, 2021) (evidence did not corroborate plaintiff's claim that he punched another inmate to avoid getting hurt or killed himself); *Pecuch v. Platt*, No. 13-CV-6102, 2015 WL 6505109, at *3 (W.D.N.Y. Oct. 27, 2015) ("[U]ndisputed video evidence shows that Plaintiff instigated the violence by walking up to White and punching him in the face."); *Louis-Charles v. Courtwright*, No. 11-cv-147, 2014 WL 457951, at *6 (N.D.N.Y. Feb. 4, 2014) ("The undisputed evidence shows that [the plaintiff] was the physical aggressor in each of his altercations with other inmates.").

Here, the evidence in the light most favorable to Cameron is that, unlike the plaintiff in *Miller*, Cameron did not enter Lajoice's cell at the start of the interaction. According to Cameron, the only actions she took at the time were to approach the threshold of Lajoice's cell and to utter part of her intended inquiry about what Lajoice's "problem" was. Cameron's conduct at that point could fairly be described as a *verbal* "confrontation," but the evidence construed in her favor does not indicate that she was a physical aggressor at that moment.

The R&R correctly notes that the incident began in a way somewhat like the incident in *Molina v. Smearsal*, No. 08CV2912, 2011 WL 127158 (N.D. Ohio Jan. 14, 2011). The plaintiff in that case stated that he believed his cellmate was going to "go off" on him, and that he confronted the cellmate in a common area by asking him "what's your problem" and raising his

hands in an "asking" gesture. 2011 WL 127158, at *1, *3 n.3. The *Molina* court concluded that "[t]he fact that Molina instigated the altercation is fatal to his claim." *Id.* at *3.

But as another Ohio federal court observed, that conclusion was dictum because the *Molina* court held earlier in its analysis that the plaintiff had not exhausted his failure-to-protect claim. *See Blacker v. Satterthwaite*, No. 08-cv-874, 2011 WL 6338851, at *8 (S.D. Ohio Oct. 14, 2011), *report and recommendation adopted*, 2011 WL 6370054 (S.D. Ohio Dec. 19, 2011). The *Blacker* court reasoned that "no blanket prohibition on a 'failure to protect' claim exists in cases where a plaintiff claims injuries resulting from a fight that he instigated with another inmate" and that "[i]nstead, the plaintiff's own conduct is one of several factors to be reviewed in determining causation." *Id.* at *9; *see also Constant v. Prack*, No. 16-CV-03985, 2022 WL 917528, at *6 (S.D.N.Y. Mar. 29, 2022) (court considered "the larger context in which force was applied").

The court finds that reasoning persuasive, and therefore declines to adopt the R&R insofar as the R&R concludes that Cameron's own conduct necessarily defeats causation. On the other hand, Defendants do not need to prevail on their causation argument because, for the reasons discussed above, they are entitled to summary judgment due to the lack of personal involvement and due to the insufficient evidence to prove the requisite mental state.

## IV.    Qualified Immunity

Finally, the court considers the issue of qualified immunity. The R&R correctly describes the principles of the qualified immunity doctrine, including the two-part inquiry as to whether a federal right was violated and whether that right was "clearly established." (Doc. 84 at 33–35.) For the reasons discussed above, the court concludes that Defendants are entitled to

summary judgment on the merits of the failure-to-protect claim.  The court therefore agrees with the R&R that Defendants do not need to rely on the qualified immunity defense.  (*Id.* at 35.)

<u>**Conclusion**</u>

The court declines to adopt the Report and Recommendation insofar as the R&R concludes that Cameron's own conduct necessarily defeats causation.  The court otherwise ADOPTS the R&R's recommendations in full.  (Doc. 84.)

Defendants' Motions for Summary Judgment (Docs. 71, 78) are GRANTED.

Dated at Burlington, in the District of Vermont, this 19th day of December, 2024.

*/s/* Geoffrey W. Crawford
District Judge
United States District Court